John R. ULRICH, Jr., M.D.,
Plaintiff–Appellant,

v.

CITY AND COUNTY OF SAN FRAN-
CISCO; Laguna Honda Hospital; Ma-
ria V. Rivero, M.D.; Theresa Berta,
M.D.; Melissa Welch, M.D., Defen-
dants–Appellees.

No. 01–15717.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 14, 2002.

Filed Oct. 11, 2002.

Edith J. Benay, San Francisco, CA, for the plaintiff-appellant.

Jonathan U. Lee, Deputy City Attorney, San Francisco, CA, for the defendants-appellees.

Before HAWKINS and FISHER, Circuit Judges, and MOSKOWITZ, District Judge.*

* The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District

FISHER, Circuit Judge.

In 1998, after nearly 10 years of service at Laguna Honda Hospital ("hospital") as a physician, John R. Ulrich, Jr., M.D., began protesting a decision by the San Francisco Department of Health to lay off a class of physicians at the hospital. He was not in the affected classification. Soon after, Dr. Ulrich received notice that he was being investigated by the hospital for professional incompetence. He subsequently resigned in protest over the layoffs, but, upon learning that his resignation might generate an adverse action report to state and federal authorities, attempted to rescind that resignation pending the outcome of the investigation of him. The hospital refused to accept his rescission of resignation and filed an adverse action report against him that leaves the impression that he resigned because he was guilty of the charges brought against him. Dr. Ulrich filed this action alleging retaliation based on speech protected by the First Amendment and denial of due process guaranteed by the Fourteenth Amendment. The district court granted summary judgment for the defendants. We affirm in part and reverse in part, holding that (1) Dr. Ulrich did not have a property right in the position from which he resigned, (2) his protest of layoffs was protected speech under the First Amendment, (3) he set forth sufficient facts demonstrating that allegedly defamatory statements were made in the course of a decision not to rehire him for purposes of establishing a liberty interest protected by the Fourteenth Amendment and (4) further proceedings are warranted on whether Dr. Ulrich stated a sufficient basis for municipal liability.

## I.

Dr. Ulrich began working as an attending physician at Laguna Honda Hospital in 1989.[1] In August 1998, he learned that, for budgetary reasons, the San Francisco Department of Health had begun to lay off physicians at the hospital. His own higher pay classification was not affected. At an August 17 staff meeting, chaired by the hospital's Medical Director, Dr. Maria Rivero, Dr. Ulrich protested the layoffs, objecting that they were "an injustice to the patients" by diminishing the physician-to-patient ratio "as well as [an injustice to] the physicians" being laid off. His comments sparked a discussion in which other staff members voiced their opposition to the layoffs and suggested that "there ought to be other ways to look at [the budgetary] problem." The following week, various staff members, including Dr. Ulrich, signed a letter of protest to two officials in the San Francisco Department of Health—Dr. Mitchell Katz, director of health, and Dr. Melissa Welch, chief medical officer—questioning the ability of the medical staff to care adequately for its caseload in the face of the layoffs.

On August 28, Dr. Ulrich received a written notice signed by Dr. Rivero and the chief of staff, Dr. Theresa Berta, stating that the hospital's Credentials/Peer Review Committee was opening a formal investigation of him into allegations of professional incompetence.[2] Dr. Ulrich scheduled a meeting with the Committee about the allegations for October 22.

---

1. We view the evidence in the light most favorable to Dr. Ulrich. *See Chevron U.S.A. Inc. v. El–Khoury,* 285 F.3d 1159, 1162 (9th Cir.2002).

2. Both Dr. Berta and Dr. Rivero were members of the Peer Review Committee; Dr. Rivero served as the Committee's chair.

On September 30, Dr. Ulrich posted a notice of his resignation, effective November 1, 1998, at the hospital's nurses' station. The notice was addressed to "the Staff, Families, Residents and Medical Director of Laguna Honda Hospital" and stated: "I am deeply disappointed by the recent decision ... to lay off two outstanding and very dedicated physicians from further service when they are near retirement." Dr. Rivero first saw the letter outside the nurses' station. She reported the contents of the letter to Dr. Berta as well as Larry Funk, the hospital's chief executive officer, and Carol Sam, director of human resources, out of "concern" that Dr. Ulrich "may have widely disseminated a letter to a number of individuals, and that some of the things in this letter were potentially negative regarding the firing or the laying off of other individuals.". On October 1, Dr. Rivero wrote to Dr. Ulrich accepting his resignation.

Thereafter, Dr. Ulrich's lawyer advised him that his resignation could trigger a reporting requirement to state and federal authorities. The federal Health Care Quality Improvement Act, 42 U.S.C. § 11101, et seq., requires that a health care entity submit an adverse action report to the National Practitioner Data Bank (NPDB) if the entity "accepts the surrender of clinical privileges of a physician ... while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." Id. § 11133. Similar reports must be filed with the California Medical Board. Cal. Bus. & Prof.Code § 805. Dr. Ulrich wrote to Dr. Rivero on October 16, rescinding his resignation pending the completion of the Committee's investigation. He also requested that the meeting scheduled for October 22 be postponed so he could prepare for it.

Dr. Rivero discussed Dr. Ulrich's rescission of resignation with Dr. Berta, Larry Funk, Carol Sam and Melissa Welch. On October 26, four days after the scheduled October 22 meeting, Dr. Rivero sent Dr. Ulrich a letter stating that "we" would not honor the revocation of the resignation, and, construing the October 16 letter to be "your announcement that you would not be attending," canceled the October 22 meeting date that had already passed. The letter concluded: "given your resignation effective November 1, 1998, no further peer review action is necessary as you will no longer have privileges or be a member of the Laguna Honda Hospital Staff."

On November 6, Dr. Rivero filed adverse action reports with the California Medical Board and the NPDB stating:

Dr. Ulrich resigned from the Medical Staff, and relinquished his privileges, following receipt of a letter announcing the commencement of a formal investigation into his practice and professional conduct as a member of the Medical Staff and while caring for patients at the Hospital. That investigation was prompted as a result of concerns regarding apparent deficiencies in his practice and conduct spanning the full range of Hospital care, including incomplete diagnoses, inappropriate diagnostic and therapeutic orders, failures to accept appropriate responsibility for the course of patient treatment, and an overall absence of clear, effective management of hospitalizations. Dr. Ulrich submitted his resignation before this investigation had progressed to any findings or recommendations.

Dr. Ulrich filed protests of the report with state and federal authorities. In response, the California Medical Board investigated the merits of the allegations of his professional improprieties and found there "was no departure in the standard

of care." The U.S. Department of Health and Human Services did not conduct an investigation of the underlying allegations and refused to void the NPDB report notwithstanding the California Medical Board findings. The hospital, which may void the NPDB report at its request, also refused to do so based on the California Medical Board findings. The NPDB report is available for all hiring hospitals and other medical employers to review. According to the presidents of two medical associations in California, it will be virtually impossible for Dr. Ulrich to obtain employment as a practicing physician at any hospital in the country if the report on file with the NPDB is not voided.

Dr. Ulrich filed this action for damages and injunctive relief in San Francisco Superior Court alleging § 1983 and state law causes of action. The defendants removed the action to federal court based on the federal questions presented. The district court granted summary judgment to the municipal defendants because it found that Dr. Ulrich did not show a custom or policy by the hospital or City violating his constitutional rights. *See Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). After receiving supplemental briefing, the court granted summary judgment on Dr. Ulrich's remaining § 1983 claims and remanded the case to the superior court. Dr. Ulrich timely appealed, framing the question before us as whether he set forth sufficient disputed facts to pursue his § 1983 claims based on violations of the First and Fourteenth Amendments.

## II.

Dr. Ulrich's § 1983 claims are based on the constitutional admonishment that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). He contends that the defendants denied him benefits associated with continued employment at the hospital in a manner that violated his interests in property, free expression and liberty of profession protected by the First and Fourteenth Amendments. We address these claims in turn.[3]

### A. *Property*

■ We address first Dr. Ulrich's claim that he was denied adequate notice and a hearing prior to the decision not to accept his rescission of resignation. This claim is based on the Fourteenth Amendment: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To prevail, Dr. Ulrich would be required to prove three elements: (1) a property interest protected by the Constitution; (2) a deprivation of the interest by the government; and a (3) lack of required process. *Portman v. County of Santa Clara,* 995 F.2d 898, 904 (9th Cir.1993). The district court found that Dr. Ulrich could not proceed to trial because, given that he voluntarily resigned his job, he could not show that he was denied any property interest by the government by the hospital's decision not to accept his rescission of resignation. We agree.

---

**3.** In this de novo review of the district court's grant of summary judgment, we must determine, viewing the evidence in the light most favorable to Dr. Ulrich, whether he has set forth specific facts showing there is a genuine issue for trial or whether the district court based the award of summary judgment on an

erroneous conclusion of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–28, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1028–31 (9th Cir.2001); Fed.R.Civ.P. 56(e).

■ The Fourteenth Amendment's due process guarantee applies to public employees who have a "property interest" in the terms or conditions of their employment. *Bd. of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). That interest is established "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. 2701.

■ We assume for purposes of analysis that Dr. Ulrich had a property interest in continued employment prior to his resignation.[4] We disagree, however, with Dr. Ulrich's assertion that his property interest in employment extended beyond the November 1 effective date of his resignation once that resignation was accepted.

According to the hospital's bylaws, a "resignation shall be final on the effective date entered on the resignation form and shall not thereafter be rescinded." Further, the resignation "shall result in termination of privileges and Medical Staff membership ... and shall not entitle the practitioner to hearing rights." From this it is clear that, after Dr. Ulrich submitted notice of his resignation, he continued to have the privileges of medical staff membership until the resignation's November 1 effective date. The question we must decide is whether the phrase "and shall not thereafter be rescinded" granted him a

right to rescind his resignation at any time before its November 1 effective date. If Dr. Ulrich had a right to rescind and thereby maintain his employment beyond November 1, then the refusal of the hospital to accept his rescission of resignation deprived him of his property interest in continued employment, triggering due process concerns.

■ In considering whether the hospital's bylaws created a "mutually explicit" understanding that Dr. Ulrich had a right to rescind his resignation triggering a duty of the hospital to accept it, *Perry,* 408 U.S. at 601, 92 S.Ct. 2694, we interpret the bylaws in light of California law. Under California law, an employee has a right to rescind a resignation unilaterally (like any contractual offer) only *prior to its acceptance.* *Am. Fed'n of Teachers v. Bd. of Educ.,* 107 Cal.App.3d 829, 166 Cal.Rptr. 89, 94 (1980); *accord Armistead v. State Pers. Bd.,* 22 Cal.3d 198, 149 Cal.Rptr. 1, 583 P.2d 744, 745 (1978). Dr. Ulrich attempted to rescind his resignation *after* its acceptance. Of course, Dr. Ulrich and the hospital were free to modify the California rule through contract, but we are not convinced they did so. We interpret the phrase "and shall not thereafter be rescinded" to prohibit the hospital from reinstating an employee after the effective date of his resignation without following the normal procedures for filling a vacancy. The phrase does not create an absolute right to rescind an accepted resignation simply because the request is made

---

4. Although physicians are included in the category of San Francisco city and county employees who "serve at the pleasure of the appointing authority," the hospital's bylaws forbid the discharge of physicians without extensive due process. The California Supreme Court has held that similar due process requirements applicable to private hospitals by statute render "the essential nature of a qualified physician's right to use the facilities of a hospital ... a property interest which

directly relates to the pursuit of his livelihood." *Anton v. San Antonio Cmty. Hosp.,* 19 Cal.3d 802, 140 Cal.Rptr. 442, 567 P.2d 1162, 1174 (1977) (quoting *Edwards v. Fresno Cmty. Hosp.,* 38 Cal.App.3d 702, 113 Cal.Rptr. 579, 580 (1974)); *see also Clements v. Airport Auth. of Washoe County,* 69 F.3d 321, 331 n.12 (9th Cir.1995) (explaining that at-will employment does not exist where an employee can "only be fired for cause or in accordance with specified policies or procedures").

before the resignation's effective date. Although Dr. Ulrich may have had a right to rescind his resignation prior to its acceptance, once it was accepted the hospital was not obliged to rescind it. Dr. Ulrich's position after the acceptance of his resignation was thus like that of the plaintiff in *Roth,* whose contract of employment was for a limited duration and who was owed no due process prior to the decision not to extend it. 408 U.S. at 578, 92 S.Ct. 2701(holding no property interest in continued employment when terms of the employment contract "did not provide for contract renewal absent 'sufficient cause' ").

Under our interpretation of the bylaws, once the hospital accepted Dr. Ulrich's resignation, which Dr. Rivero did on October 1, whether to reinstate him lay in the discretion of the hospital's decision-makers. No constitutionally protected property interest can exist in the outcome of a decision "unmistakably committed ... to the discretion of the[public entity]." *Parks v. Watson,* 716 F.2d 646, 657 (9th Cir.1983). Accordingly, we affirm the district court's summary adjudication of Dr. Ulrich's § 1983 claim based on the depri-

vation of property interests protected by the Fourteenth Amendment.[5]

### B. *Free Expression*

Dr. Ulrich next claims that the refusal to rescind his resignation and the disciplinary investigation of him were to punish him for speech protected by the First Amendment. To succeed on this claim, it was Dr. Ulrich's initial burden to demonstrate that (1) he was subjected to an adverse employment action, such as being denied a benefit or privilege by the hospital, (2) he engaged in speech that was constitutionally protected because it touched on a matter of public concern and (3) the protected expression was a substantial motivating factor for the adverse action. *Huskey v. City of San Jose,* 204 F.3d 893, 899 (9th Cir.2000); *see also Pool v. VanRheen,* 297 F.3d 899, 906 (9th Cir. 2002); *Allen v. Iranon,* 283 F.3d 1070, 1074 (9th Cir.2002). Upon these showings, the burden shifts to the public employer to demonstrate either that, under the balancing test established by *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), its legitimate administrative interests outweighed Dr. Ulrich's

5. Dr. Ulrich also alleges that he had a constitutionally protected property interest in certain of the procedures required of the Peer Review Committee's investigation, including that he be entitled to meet with the Committee and that its actions not be arbitrary. "[I]t has long been settled that a contract can create a constitutionally protected property interest," but it is equally true that "not *every* interference with contractual expectations" violates constitutional property interests. *San Bernardino Physicians' Servs. Med. Group, Inc. v. County of San Bernardino,* 825 F.2d 1404, 1407–08 (9th Cir.1987). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554,

56 L.Ed.2d 30 (1978), citing *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. Dr. Ulrich was given two opportunities to meet with the Peer Review Committee prior to his resignation. His interest in meeting with the Committee after his resignation does not rise to a constitutionally protected property interest under federal law. *See San Bernardino Physicians' Servs.,* 825 F.2d at 1409(describing "crucial factors" in determining whether a property interest exists as "the security with which [the interest] is held under state law and its importance to the holder") (*quoting Brown v. Brienen,* 722 F.2d 360, 364 (7th Cir.1983)). We find no evidence that the Committee acted arbitrarily. Nor does the Fourteenth Amendment protect a "general liberty interest in being free from capricious government action." *Nunez v. City of Los Angeles,* 147 F.3d 867, 873 (9th Cir. 1998).

First Amendment rights or that, under the mixed motive analysis established by *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), it would have reached the same decision even in the absence of the plaintiff's protected conduct. *Pool*, 297 F.3d at 906; *Allen*, 283 F.3d at 1074; *Gilbrook v. City of Westminster*, 177 F.3d 839, 853–54, 866–67 (9th Cir.1999).

### 1. *Adverse employment actions.*

 Dr. Ulrich has set forth sufficient facts showing that he was subject to adverse employment actions. To meet this element of a First Amendment retaliation claim, Dr. Ulrich had to demonstrate only that he suffered a loss of any "governmental benefit or privilege" in retaliation for protected speech activity, not that he had a legal right to the benefit denied him. *Hyland v. Wonder*, 972 F.2d 1129, 1134–35 (9th Cir.1992) ("*Hyland I*"). The denial of even a "trivial" benefit may form the basis for a First Amendment claim where the aim is to punish protected speech. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75–76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Elrod v. Burns*, 427 U.S. 347, 359 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (explaining that First Amendment rights are violated "both where the government fines a person a penny … and where it withholds the grant of a penny" to punish or suppress protected speech); *see also Hyland I*, 972 F.2d at 1135 (discussing cases). Dr. Ulrich was subjected to more than trivial adverse employment actions. The hospital subjected him to an investigation that threatened to revoke his clinical privileges. It subsequently refused to rescind his resignation and filed an adverse action report against him, marring his employment record. Although these decisions by the hospital could have been taken for a number of reasons, if they were in retaliation for his protected speech activity then the First Amendment was violated. *Mt. Healthy*, 429 U.S. at 283–84, 97 S.Ct. 568 (explaining that even though the plaintiff "could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, he may nonetheless establish a claim … if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms") (citation omitted).

### 2. *Protected expression.*

 Although the government has "a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large," *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), public employees do not lose their rights as citizens to participate in public affairs by virtue of their government employment. *Connick v. Myers*, 461 U.S. 138, 144–45, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In recognition that "[g]overnment employees are often in the best position to know what ails the agencies for which they work," *Waters*, 511 U.S. at 674, 114 S.Ct. 1878, the First Amendment may prohibit government retaliation against employee speech that touches matters of "public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684; *see also Weeks v. Bayer*, 246 F.3d 1231, 1235 (9th Cir.2001) (describing First Amendment doctrine as based on the principle that public employees "should be encouraged 'to speak out about what they think and know without fear of retribution, so that citizens may be informed about the instruments of self-governance'") (quoting *Gilbrook*, 177 F.3d at 870). If public employee speech cannot be fairly characterized as constituting speech on a matter of public concern, the First Amendment is inapplicable and the court need not scruti-

978

nize the reasons for any adverse actions. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.

■ The defendants argue, and the district court found, that Dr. Ulrich's speech was not subject to constitutional protection because it did not involve a matter of public concern. We review this question of law de novo, looking to the "content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48 & n. 7, 103 S.Ct. 1684.

■ (a) *Content.* When speech addresses "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government," it "falls squarely within the boundaries of public concern." *Weeks,* 246 F.3d at 1234. By contrast,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick,* 461 U.S. at 147, 103 S.Ct. 1684.

We conclude that the district court erred in finding that Dr. Ulrich's speech did not involve a matter of public concern. The scope of the public concern element is defined broadly in recognition that "one of the fundamental purposes of the first amendment is to permit the public to decide for itself which issues and viewpoints merit its concern." *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983). It is only "when it is clear that ... the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies" that speech of

government employees receives no protection under the First Amendment. *Pool,* 297 F.3d at 907 (quoting *McKinley,* 705 F.2d at 1114) (emphasis added by *Pool*); *accord Connick,* 461 U.S. at 146, 103 S.Ct. 1684 (holding that First Amendment affords no protection "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community"). In *Connick,* the Supreme Court held that the distribution of a questionnaire to office employees was not protected speech when its sole purpose was to bolster the employee's position in a personal dispute with her employer and "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." 461 U.S. at 148, 103 S.Ct. 1684. Similarly, in *Havekost v. United States Dep't of the Navy,* 925 F.2d 316 (9th Cir.1991), we held that the circulation of a petition arising from "an internal dispute over the Navy's dress code, scheduling, and responsibility for certain lost commissary profits" were "the minutiae of workplace grievances" of no more public concern "as would be the length and distribution of coffee breaks." *Id.* at 319. The same cannot be said about Dr. Ulrich's speech.

Dr. Ulrich's protests of the layoff of physicians touched on the ability of the hospital to care adequately for patients, sparking debate about whether there were less harmful ways to address the hospital's budgetary problems. There is a clear "public import in evaluating the performance" of a public agency to assess the "efficient performance of its duties." *Connick,* 461 U.S. at 148, 103 S.Ct. 1684; *accord McKinley,* 705 F.2d at 1114. Thus, public employee speech is protected when it debates the allocation of school funds, *Pickering,* 391 U.S. at 571–72, 88 S.Ct. 1731; criticizes the failure to grant pay raises that may affect the hiring and reten-

tion of police officers, *McKinley*, 705 F.2d at 1114; questions a city's preparedness to respond to fires due to budget cuts and firefighter layoffs, *Gilbrook*, 177 F.3d at 866; and highlights inappropriate standards affecting patient care at a public hospital, *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1406 (9th Cir.1988). Dr. Ulrich's challenges to the allocation of budgetary resources by questioning the ability of the hospital to care effectively for patients in the face of physician layoffs falls squarely within this line of cases. "[A]n opinion about the preparedness of a vital public-safety institution ... goes to the core of what constitutes speech on matters of public concern." *Gilbrook*, 177 F.3d at 866.

■ (b) *Form and context.* Although we consider the content of Dr. Ulrich's speech "first and foremost," the form and context of his speech are also relevant to our assessment of whether it is protected under the First Amendment. *Weeks*, 246 F.3d at 1234–35. In this evaluation, "we focus on the *point* of the speech," *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1223 (9th Cir.1996), looking to such factors as the "employee's motivation and the audience chosen for the speech." *Gilbrook*, 177 F.3d at 866; *cf. Havekost*, 925 F.2d at 318 (noting that "motive should not be used as a litmus test for public concern; rather, 'content is the greatest single factor in the *Connick* inquiry'") (quoting *Berg v. Hunter*, 854 F.2d 238, 243 (7th Cir.1988)).

■ Although there is no evidence that Dr. Ulrich expressed his views to the press or representatives of the public at large, this does not defeat his claim. Dr. Ulrich raised his concerns at staff meetings, in a letter to the Department of Health signed by a number of medical staff and in his announcement of resignation posted at the nurse's station where staff could read it.

These aspects of Dr. Ulrich's speech indicate that he spoke "in order to bring wrongdoing to light," not "merely to further some purely private interest." *Havekost*, 925 F.2d at 318. Where speech is so directed, the public employee does not forfeit protection against governmental retaliation because he chose to press his cause internally. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) ("Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."); *see also Chateaubriand*, 97 F.3d at 1223 ("The form of the speech—complaints to staff and superiors rather than to the general public—does not remove it from the realm of public concern."). We therefore turn to the question of whether Dr. Ulrich set forth sufficient facts from which a jury could conclude that his speech was a substantial motivating factor for the adverse treatment he received.

### 3. *Substantial motivating factor.*

■ The district court did not address whether Dr. Ulrich set forth specific facts showing an unconstitutional motivation for his treatment, but the parties have briefed the issue and we have the record before us. We hold that Dr. Ulrich has presented sufficient evidence that, if accepted by a jury, would meet the causation element of a First Amendment retaliation claim.

■ As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence, *Allen v. Iranon*, 283 F.3d 1070, 1074 (9th Cir.2002), and involves questions of fact that normally should be left for trial. *See Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) ("[I]t

was error in this case for the District Court to resolve the disputed fact of motivation at the summary judgment stage."). Here, there is direct evidence that Dr. Ulrich's speech was a motivating factor in Dr. Rivero's decisions regarding Dr. Ulrich. Upon seeing Dr. Ulrich's resignation letter posted at the nurse's station, Dr. Rivero stated that she became concerned that Dr. Ulrich "may have widely disseminated a letter to a number of individuals, and that some of the things in this letter were potentially negative regarding the firing or the laying off of other individuals." Although she denies that this concern was a basis for her later decision not to accept Dr. Ulrich's rescission of resignation and to file an adverse action report with the NPDB, that is an issue of credibility for the jury to evaluate. Generally, a plaintiff need only offer "very little" direct evidence of motivation to survive summary judgment on this element. *Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir.2001); *Chuang v. Univ. of Cal.*, 225 F.3d 1115, 1128 (9th Cir.2000); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998); *see also Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985) (explaining that "any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder"). Dr. Ulrich clearly passes this threshold.

Dr. Ulrich also has provided circumstantial evidence from which a jury could infer that his protected speech formed a substantial motivation for the adverse treatment of him. Where it is shown that the employer knew of the speech, which is not disputed here, circumstantial evidence showing motive may fall into three, nonexclusive categories: "(1) proximity in time between the protected speech and the alleged retaliation; (2) the employer's expressed opposition to the speech; and (3) other evidence that the reasons proffered by the employer for the adverse employment action were false and pretextual." *Allen*, 283 F.3d at 1077; accord *Keyser v.Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001). Dr. Ulrich has set forth evidence in all three categories.

First, all the adverse actions about which Dr. Ulrich complains came close on the heels of his protected speech activity. Dr. Ulrich received notice that the peer review investigation was being initiated against him the week after he signed a letter of protest about the layoffs at the hospital and two weeks after his comments at a staff meeting sparked other staff members' concern. Dr. Rivero decided to deny Dr. Ulrich's request to rescind his resignation two weeks after she saw, and expressed concern about, his resignation letter posted at the nurse's station. And she made the decision to file an adverse action report about Dr. Ulrich to state and federal authorities five days after the effective date of Dr. Ulrich's resignation and a little over a month after his resignation notice was posted. The proximity in time between each of these adverse actions and Dr. Ulrich's speech is well within time frames we have held sufficient for a jury to infer discriminatory motive. *See Allen*, 283 F.3d at 1078 (holding that an 11–month gap in time between the protected speech and denial of a government benefit "is within the range that has been found to support an inference than an employment decision was retaliatory").

Second, Dr. Rivero's statement that she was concerned that Dr. Ulrich may have "widely disseminated" his letter of resignation and that it was "potentially negative" about the hospital may be inferred to have been an instance of expressed opposition to Dr. Ulrich's speech. Although Dr. Rivero did not communicate a "warning"

to Dr. Ulrich that he should not speak out, *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir.1988), nor did she state to Dr. Ulrich's coworkers that he should be removed for his opinions, *Scribner*, 812 F.2d at 434–35, given the proximity between Dr. Ulrich's speech and the alleged retaliatory acts, and the evidence of pretext that we describe below, a jury would be justified in concluding that Dr. Rivero's statement reflected her opposition to Dr. Ulrich's speech and that she took action punishing him based on this opposition.

Finally, Dr. Ulrich has presented evidence from which a jury could conclude that Dr. Rivero's stated reason for filing an adverse action report against him was false and pretextual. Dr. Rivero stated that she filed the adverse action report because she believed that the investigation of Dr. Ulrich was still pending on the November 1 effective date of his resignation. But the hospital's bylaws state that an investigation shall reach a conclusion within 60 days of its commencement, which would have been on October 25. There is no record of any decision to extend the investigation, and no notice of extension was given to Dr. Ulrich despite requirements in the hospital's bylaws that if the Peer Review Committee defers the completion of the investigation beyond 60 days from its commencement, "it shall so notify the affected practitioner." The only notice Dr. Ulrich received about the timing of the investigation was Dr. Rivero's October 26 letter stating that the investigation would not be continued given his resignation and that no future meeting with him would be scheduled. Indeed, Dr. Ulrich has pointed to minutes from a Committee meeting in early October indicating the Committee decided to conclude its investigation without speaking to him. A jury could find from these facts that Dr. Rivero's assertion that she was required to file an adverse action report against Dr. Ulrich because an investigation was pending on November 1 was false and pretextual.

### 4. *Defendants' burden.*

Dr. Ulrich met his burden of setting forth sufficient facts demonstrating that he was subjected to an adverse employment action, he engaged in constitutionally protected expression and the protected expression was a substantial motivating factor for the adverse action. The defendants have made no showing under *Pickering* that their legitimate administrative interests outweigh Dr. Ulrich's First Amendment rights or under *Mt. Healthy* that they would have reached the same decisions in the absence of Dr. Ulrich's protected speech, so we have no basis on which to affirm the district court's summary adjudication of Dr. Ulrich's First Amendment claim. *Cf. Brewster v. Bd. of Educ.*, 149 F.3d 971, 979–980 (9th Cir.1998) (describing the balance of factors under *Pickering* as "fact-sensitive, context-specific"). We therefore reverse the summary adjudication in favor of the defendants and remand for further proceedings on this claim.

### C. *Liberty*

We turn to Dr. Ulrich's claim that the failure of the defendants to give him notice and an opportunity to contest the filing of the adverse action reports filed against him deprived him of liberty without due process of law in violation of the Fourteenth Amendment. This claim is rooted in the centuries-old principle that a state may not deprive a person of the freedom "to engage in any of the common occupations of life" without due process. *Bd. of Regents v. Roth*, 408 U.S. 564, 572–73, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir.1985) (tracing the concept of liberty of occupation to 18th century writ-

ings of James Madison and early 20th century Supreme Court decisions). More specifically, it is based on the case law that followed the statement in *Roth* that a plaintiff who had no property interest in continued employment may nonetheless be entitled under the Fourteenth Amendment to a hearing if a decision not to rehire him was accompanied by "any charge against him that might seriously damage his standing and associations in his community" or "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573, 92 S.Ct. 2701.

■■■ Out of a concern that the Fourteenth Amendment not become "a font of tort law to be superimposed upon whatever systems may already be administered by the States," soon after *Roth* the Court held that injury to reputation alone is not sufficient to establish a deprivation of a liberty interest protected by the Constitution. *Paul v. Davis*, 424 U.S. 693, 701, 711, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The Court in *Paul* reaffirmed, however, *Roth's* suggestion that "governmental action defaming an individual *in the course of declining to rehire him* could entitle the person to notice and an opportunity to be heard as to the defamation." *Id.* at 709, 96 S.Ct. 1155 (emphasis added). The rule in *Paul* has come to be known as the "stigma plus" test for establishing deprivation of liberty based on governmental defamation. Under that test, a plaintiff must show the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, *plus* the denial of "some more tangible interest[ ] such as employment," or the alteration of a right or status recognized by state law. *Id.* at 701, 711, 96 S.Ct. 1155; *see also Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir.2002); *Llamas v. Butte Cmty.*

*Coll. Dist.*, 238 F.3d 1123, 1129 (9th Cir. 2001). Where these elements exist, the plaintiff is "entitled to notice and a hearing to clear his name." *Bollow v. Federal Reserve Bank*, 650 F.2d 1093, 1100 (9th Cir.1981).

■■ The district court did not address the stigma and contested accuracy elements of Dr. Ulrich's claim because it found that he had not shown that the hospital denied him employment or some more tangible governmental benefit as required by *Paul*. It based this finding on *Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), which held that *Paul's* stigma plus test was not met when "[t]he alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, since he voluntarily resigned from his position at the hospital, and the [allegedly defamatory] letter was written several weeks later." The district court found *Siegert* determinative of Dr. Ulrich's claim, stating: "The parallel between *Siegert* and the instant case is clear."

■■ Although there is a clear similarity between this case and *Siegert* in that both plaintiffs voluntarily resigned their employment, there is also a crucial difference: Dr. Ulrich sought rehire. *Siegert* reaffirmed the principle in *Roth* that an employee with no property interest in his job may nonetheless base a deprivation of liberty claim on defamatory statements "made in the context of the employer ... failing to rehire" him. 500 U.S. at 233, 111 S.Ct. 1789. In *Siegert* there was no failure to rehire because the plaintiff there did not seek to rescind his resignation. Here, on the contrary, Dr. Ulrich attempted to rescind his resignation while he was still on the job, and thereby maintain his employment status. Even though we have held that Dr. Ulrich had no enforceable right to reinstatement, his position was comparable

to that of the employee in *Roth* where the employer had no obligation to extend the employee's contract past its expiration point. *Cf. Loehr v. Ventura County Cmty. Coll. Dist.,* 743 F.2d 1310, 1317 (9th Cir. 1984) (holding that a "failure to demonstrate a property interest ... will not defeat a properly asserted liberty interest claim"). Both Dr. Ulrich and the plaintiff in *Roth* sought the benefit of rehire by their employer. By rejecting Dr. Ulrich's attempt to maintain his employment, the hospital provided the link missing in *Siegert:* the "loss of employment resulted from some further action by the defendant in addition to the defamation." *Aversa v. United States,* 99 F.3d 1200, 1216 (1st Cir.1996) (interpreting *Siegert).*

The allegedly defamatory statements also were made "in the course of" the refusal to rehire Dr. Ulrich. This element does not require a strict temporal link between the defamation and the nonrenewal or discharge; rather, the defamatory statement must be "so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye." *Campanelli v. Bockrath,* 100 F.3d 1476, 1482 (9th Cir.1996) (holding that statements to press one week after discharge met standard). This standard is met here. Just five days after Dr. Ulrich's staff privileges were terminated, Dr. Rivero filed with the NPDB the report that suggested Dr. Ulrich resigned because he was guilty of the charges levied against him. Such an implication had the potential to make the resignation itself stigmatizing in the eyes of potential employers—an effect that would have been avoided if Dr. Rivero had accepted Dr. Ulrich's rescission of resignation. When the decision not to rehire an employee and the stigmatizing statement are so closely linked, the "plus" element for a liberty claim is met. Accordingly, we hold that Dr. Ulrich's claim is not for "[d]efamation, by itself," *Siegert,*

500 U.S. at 233, 111 S.Ct. 1789, but rather for stigmatizing statements made in the course of refusing to rehire him, a claim long recognized as legitimately brought under the Fourteenth Amendment.

The district court did not address whether Dr. Ulrich has set forth sufficient facts demonstrating that the statements disclosed in the NPDB report were stigmatizing, *see Portman v. County of Santa Clara,* 995 F.2d 898, 908 (9th Cir.1993); *Roley v. Pierce County Fire Protection Dist. No. 4,* 869 F.2d 491, 495–96 (9th Cir.1989), or whether they created "a false and defamatory impression." *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *see also Campanelli,* 100 F.3d at 1484 (explaining that "whether the defendants' alleged characterization of events ... is substantially false is an issue of fact"). Nor did the district court address whether the Fourteenth Amendment guaranteed Dr. Ulrich more due process than the opportunity he had to contest the report with the Department of Health and Human Services. *See* 45 C.F.R. § 60.14(a) ("Any physician, dentist or other health care practitioner may dispute the accuracy of information in the Data Bank concerning himself or herself."). We therefore reverse the summary adjudication of Dr. Ulrich's liberty claim and remand for further proceedings.

### D. *Municipal Liability*

▆▆▆▆ Finally, we address whether the district court properly dismissed Dr. Ulrich's claims against the municipal defendants for a failure to set forth specific facts showing a basis for municipal liability. Section 1983 provides a cause of action against any "person" who, under color of law, deprives any other person of rights, privileges, or immunities secured by the Constitution or laws of the United States. The term "person" includes municipalities.

*Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality cannot, however, "be held liable under § 1983 on a respondeat superior theory." *Id.* at 691, 98 S.Ct. 2018; *accord Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior."). Liability may attach to a municipality only where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality) ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.").

The district court found that Dr. Ulrich "made no showing of a custom or policy by the Hospital or City to deny due process through proper hearing procedures." The court also denied Dr. Ulrich's Rule 56(f) request that summary judgment on municipal liability be continued based on Magistrate Judge Brazil's grant of his motion to compel depositions of non-party members of the Peer Review Committee. The court stated: "Magistrate Judge Brazil *limited* those depositions to the facts relevant to Dr. Ulrich's case. Therefore, further discovery will not enable plaintiff to present evidence of due process denials in other cases that would be necessary to defeat defendants' motion."

Dr. Ulrich argues on appeal that the district court's dismissal of the municipal defendants, and the denial of his Rule 56(f) motion, were based on the incorrect legal conclusion that he was required to prove similar treatment of "other cases" in order to hold the municipal defendants liable for the alleged deprivations of his constitutional rights. He argues that he has set forth sufficient evidence from which we may conclude that Dr. Rivero was acting as the designated policymaking representative of the municipality and therefore the municipality may be held liable for her actions.[6]

Dr. Ulrich is correct that he need not show a series of similar acts to establish municipal liability. Showing a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity" is one way to establish municipal liability. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir.2001). Dr. Ulrich concedes that he cannot establish municipal liability through this route. There are,

---

6. We reject the argument that Dr. Ulrich waived this argument by not making it before the district court. In documents filed with the district court both before and after the defendants' motion for summary judgment on the *Monell* issue, Dr. Ulrich alleged that Dr. Rivero, as the medical director, "acted for the Governing Body" of the hospital and that his medical privileges were "terminated by Laguna Honda, its officers and directors." Statement of Undisputed Facts (August 28, 2000); Petition for Writ of Mandate (January 2, 2001). Likewise, the record of the hearing before the district court on defendants' motion for summary judgment reveals that Dr. Ulrich clearly argued that the deprivation of his rights was caused in large part by Dr. Rivero who was acting on behalf of the governing body of the hospital, with "agreement by the decision-makers of the hospital," "sanctioned at the highest level." The district court decided the *Monell* issue without any indication that it believed Dr. Ulrich had waived his ability to make these arguments.

however, two other routes available for a plaintiff to establish the liability of municipal defendants: (1) by showing that the decision-making official was, as a matter of state law, a final policymaking authority "whose edicts or acts may fairly be said to represent official policy" in the area of decision, *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality); *Pembaur*, 475 U.S. at 480–81, 106 S.Ct. 1292; or (2) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate. *Praprotnik*, 485 U.S. at 126–27, 108 S.Ct. 915; *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292; *see also Hopper*, 241 F.3d at 1083. We address these two possible bases for municipal liability in turn.

### 1.

■ Dr. Ulrich failed to establish that, as a matter of state law, Dr. Rivero was the final policymaking authority for the decisions affecting his rights. For this determination, it is not sufficient to show that Dr. Rivero had discretion to make the decisions. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. at 482–83, 106 S.Ct. 1292(citations and footnote omitted).

"[U]nder California law, a city's Charter determines municipal affairs such as personnel matters." *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir.1997) ("*Hyland II*"). The Charter of the City of San Francisco delegates broad powers over the operation of the City's public hospitals to the San Francisco Health Commission. S.F. Charter § 4.110. Likewise, the San Francisco Health Commission is listed in the hospital's bylaws as the "Governing Body" of the hospital, holding "ultimate authority" over the operation of the hospital.

Dr. Ulrich argues that Dr. Rivero is the final authority on matters of employment policy because the hospital's bylaws state the medical director's job description as consisting in part of acting "on behalf of the Governing Body in the medical management of the hospital." These bylaws may be evidence that Dr. Rivero has been delegated final policymaking authority, a subject that we deal with below. It does not establish that, as a matter of state law, Dr. Rivero was the final policymaking authority with regard to the decisions at issue in this case. Indeed, the bylaws specifically discuss a different individual who may possess the governing body's policymaking authority in this area: "Where the governing body has delegated authority to the *Director of Health* regarding appointments, reappointments, termination of appointments, and the granting or revision of clinical privileges, the term 'governing body' shall refer to the Director of Health." At the time relevant here, Dr. Katz, not Dr. Rivero, occupied the position of "Director of Health." Accordingly, we are unable to conclude that under state law Dr. Rivero was the final policymaking authority with respect to the decisions at issue in this case.

### 2.

■ We remand for consideration of whether any of the defendants, however, had been delegated final policymaking authority over the decisions at issue or whether those decisions were ratified by officials with final policymaking authority. These inquiries may turn on questions of fact. *See McKinley v. City of Eloy*, 705

F.2d 1110, 1116 (9th Cir.1983) (holding municipality liable based on trial testimony that "the City had delegated to the city manager the ultimate responsibility for personnel decisions").

An official may be found to have been delegated final policymaking authority where "the official's discretionary decision is [not] 'constrained by policies not of that official's making' and ... [not] 'subject to review by the municipality's authorized policymakers.'" *Christie v. Iopa,* 176 F.3d 1231, 1236–37 (9th Cir.1999), citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915; *see also Hyland II,* 117 F.3d at 415(holding city liable where final policymaking authority "left the internal management" to the department head "and attempted not to interfere"). The district court made no findings in this regard. It is not clear from the record whether Dr. Rivero had delegated policymaking authority over the decision not to rescind Dr. Ulrich's resignation or whether her decisions were ratified by policymaking officials. As we discussed above, the hospital's bylaws suggest that Dr. Rivero may have possessed delegated policymaking authority over employment matters. Dr. Welch testified that Dr. Rivero's decisions on the hiring and firing of employees, and specifically her decision on whether to accept Dr. Ulrich's rescission of resignation, were not subject to review by the Governing Board. It may also be possible to infer from Dr. Rivero's consultations with Dr. Welch and others about her decision to reject Dr. Ulrich's rescission of resignation that her actions were ratified by policymaking officials. Similarly, it is not clear whether Dr. Rivero and Dr. Berta had been delegated policymaking authority with regard to the decision to instigate an investigation of Dr. Ulrich's medical practices. The hospital's bylaws appear to leave that decision completely in their hands and there is no record that it was subject to review by any other authority.

Because the resolution of this question turns on an analysis of the record best left to the district court in the first instance, we remand for further proceedings on whether the hospital and the City and County of San Francisco can be held liable for any constitutional infringements found to exist based on delegation or ratification. Given this remand, we vacate the district court's ruling on Dr. Ulrich's Rule 56(f) request so that the district court may address these questions based on the entire record before it.

## III.

We reverse the district court's summary adjudication of Dr. Ulrich's § 1983 claims based on violations of the First Amendment and the Fourteenth Amendment's protection of liberty interests. We affirm the district court's summary adjudication of Dr. Ulrich's § 1983 claims based on the deprivation of property interests protected by the Fourteenth Amendment. We reverse the district court's summary adjudication of the municipal defendants' liability and remand for further proceedings on whether there is a factual basis for liability based on delegation or ratification doctrines. Each party shall bear its own costs.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**