NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1720
_____

JOSEPH V. PATERNO, a/k/a Jay; WILLIAM KENNEY

v.

THE PENNSYLVANIA STATE UNIVERSITY

Joseph "Jay" V. Paterno, William Kenney,

Appellants

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-14-cv-04365)
District Judge: Honorable Lawrence F. Stengel
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 9, 2016
_____

Before: JORDAN, GREENAWAY, JR., and RENDELL, *Circuit Judges*.

(Opinion Filed: May 9, 2017)

_____

OPINION[*]
_____

GREENAWAY, JR., *Circuit Judge*.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Plaintiffs-Appellants Joseph "Jay" Paterno and William Kenney (collectively "Appellants") appeal the District Court's grant of Defendant-Appellee the Pennsylvania State University's ("Penn State") Rule 12(b)(6) motion to dismiss. The District Court properly granted the motion. We will affirm.

## I.    Background

This suit arises out of Appellants' allegations of being deprived of liberty and property interests in their reputations and employment. They also allege a civil conspiracy to deprive them of those interests. Appellants were assistant football coaches with the Penn State football program under Head Coach Joseph "Joe" Paterno ("Head Coach Paterno"). On November 9, 2011, the Penn State Board of Trustees voted to relieve Head Coach Paterno of his duties due to his failure to address former Penn State assistant football coach Gerald Sandusky's sexual abuse of children (the "Sandusky Scandal").[1] A few months later, on January 6, 2012, Penn State announced that it had hired William O'Brien to replace Head Coach Paterno. Coach O'Brien released Appellants from their positions, and they were subsequently fired by Penn State in mid-January 2012.

On November 11, 2011, Penn State formed a Special Investigations Task Force, which engaged Freeh Sporkin & Sullivan, LLP (the "Freeh Firm") (1) to investigate the alleged failure of Penn State to respond to and report the Sandusky Scandal and (2) to

---

[1] Sandusky was charged and convicted of "various criminal offenses, including aggravated criminal assault, corruption of minors, unlawful contact with minors and endangering the welfare of minors." First Am. Compl. ¶ 1.

recommend policies that would allow Penn State to more effectively prevent and respond to incidents of sexual abuse of minors. The Freeh Firm published its report (the "Freeh Report") on July 12, 2012. On July 22, 2012, the National Collegiate Athletic Association (the "NCAA") prepared a Consent Decree—using the Freeh Report as its underlying basis—that sanctioned Penn State for its role in the Sandusky Scandal. As part of the sanctions, Penn State waived any claim to further NCAA-established processes to determine and appeal violations (the "NCAA Rights").

Appellants filed suit against Penn State on July 21, 2014, alleging federal and state law violations in the termination of their employment. Appellants also filed an amended complaint on November 24, 2014. Appellants alleged that Penn State deprived them of their liberty and property interests without due process in violation of 42 U.S.C. § 1983. Appellants alleged that the Consent Decree deprived them of their procedural rights as established in Penn State's bylaws, charter, and standing orders that govern Penn State's relationship with the NCAA and with them (the "Penn State Rights"). They also alleged the following state law claims: intentional interference with prospective contractual relations; civil conspiracy; violation of the Pennsylvania Wage Payment and Collection Law; and breach of contract. Appellee filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

The District Court dismissed Appellants' claims of deprivation of property and liberty interests without due process and civil conspiracy. The District Court found that Appellants had no property interest in their continued employment and thus could not be

3

deprived of it. The Court also found that Appellants did not properly allege a deprivation of liberty interest in their reputations. Finally, the District Court dismissed the conspiracy claim because it had dismissed the § 1983 claims as the object of the conspiracy.

After dismissing the federal claims, the District Court declined to exercise supplemental jurisdiction over the remaining state law claims. This appeal followed.

## II.    Standard of Review[2]

We exercise plenary review over a district court's grant of a motion to dismiss. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[W]e are 'required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant.'" *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)). We "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Id.* (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

---

[2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 but declined to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291.

4

### III.    Analysis

On appeal, Appellants raise two issues.  First, they contend that their complaint alleged enough facts to state a plausible § 1983 claim that Penn State deprived them of their liberty interest in their reputations in conjunction with (1) the loss of their property interests in their NCAA and Penn State Rights[3] and (2) their termination.  Second, they assert that their complaint alleged sufficient facts to state a civil conspiracy claim predicated on the § 1983 claim.

### A.    Loss of Liberty Interest in Reputation Claims

In order to support a due process claim for deprivation of a liberty interest in reputation, the plaintiff must show (1) a stigma to his or her reputation *plus* (2) a deprivation of an additional right or interest.  *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  This conjunctive analysis is known as the "stigma-plus" test.  *Id.*  In the public-employment context, an employer must have "create[d] and disseminate[d] a false and defamatory impression about the employee in connection with his termination" in order for a plaintiff to satisfy the test.  *Id.* (quoting *Codd v. Velger*, 429 U.S. 624, 628 (1977)).

Appellants alleged that the execution of the Consent Decree, press conference statements from the NCAA, press releases from Penn State, their termination, and the

_____

[3] The NCAA Rights afford "involved individuals" notice and opportunity to respond to allegations of violations of the NCAA's rules.  First Am. Compl. ¶¶ 112, 114–15.  An "involved individual" is a person "who is alleged to have significant involvement in an alleged rules' violation."  First Am. Compl. ¶ 116.  The Penn State Rights provide a name-clearing hearing.

loss of their NCAA and Penn State Rights deprived them of their liberty interests in their reputations. Specifically, Appellants alleged that Penn State made or adopted the following statements (collectively, "the Statements") that harmed their reputations:

- Consent Decree statement (the "Actionable Statement");

- January 6, 2012 press release (the "O'Brien Press Release");

- January 23, 2012 press release;

- February 18, 2012 press release;

- Press conference statements announcing the Consent Decree (the "Press Conference Statements");

- Post-press conference press release (the "PSU Release").

We review the Statements to determine whether they plausibly created a defamatory impression about Appellants.

1.    **Actionable Statement**

The Consent Decree included the following Actionable Statement from the Freeh Report: "[S]ome coaches, administrators and football program staff members ignored the red flags of Sandusky's behaviors and no one warned the public about him." First Am. Compl. ¶ 169.

Appellants complained that "[t]he effect of the Actionable Statement was that . . . following the lengthy investigation by the Freeh Firm, both Penn State and the NCAA . . . had come to the conclusion that Plaintiffs, as coaches with the Penn State football program, were involved in child sexual abuse conduct and therefore it is this Actionable

6

Statement that has caused Plaintiffs their injury." First Am. Compl. ¶ 176. While Appellants conceded that the Actionable Statement did not name either of them, they alleged that "some coaches" is "a limited group of individuals that includes Plaintiffs, is discrete in size and consists of people who are well-known in the community or whose identity could easily be discovered upon inquiry." First Am. Compl. ¶ 178. In their brief, Appellants support this assertion by arguing that it is reasonable for many people who heard or read the phrase "some coaches" to believe that it included Appellants, and that Appellants were "complicit and/or turned a blind eye to the child sex abuse." Appellants' Br. at 32.

Although the group of coaches to whom the Actionable Statement applies is small, "a group's size is not the sole consideration in determining whether individual members may assert defamation claims based upon statements about the group." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015–16 (3d Cir. 1994). Rather, "statements which disparage [the group] may not serve as a basis for an individual defamation claim unless a reader could reasonably connect them to the complaining individual." *Id.* at 1016.

Here, there is no reasonable connection between "some coaches" and Appellants. The Consent Decree provides that "[t]he entirety of the factual findings in the Freeh Report" supported the NCAA conclusions. App. 102. After noting that "[a] detailed recitation of the Freeh Report is not necessary," the Consent Decree quotes three paragraphs from the report's Executive Summary. App. 102. The Actionable Statement

7

appears within this quotation.  As such, the Actionable Statement is a summary of the findings in the body of the Freeh Report and applies to the coaches named in the report. The only coaches, apart from Sandusky, referenced by name in the report are Head Coach Paterno and assistant football coach Michael McQueary.[4]  Furthermore, Head Coach Paterno and McQueary are the only coaches implicated in the Freeh Report for failing to intervene appropriately in the Sandusky Scandal.[5]  And only Head Coach Paterno is named in the Consent Decree.  Thus, viewing Appellants' complaint in the most favorable light to Appellants does not allow for a reasonable nexus between the use of "some coaches" and Appellants.

Even if there were a nexus, Appellants still have failed to allege that the Actionable Statement was made "in connection with" their terminations.  *Hill*, 455 F.3d at 236 (quoting *Codd*, 429 U.S. at 628).  To be considered "in connection with" a termination, the defamatory statement must be "so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye."  *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 983 (9th Cir. 2002) (internal quotation marks omitted).  Temporal proximity is a crucial consideration in this analysis.  *See Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (declining to find

_____

[4] The link to the Freeh Report provided in Exhibit F is nonfunctional.  We rely on the following archived link to the report:
https://web.archive.org/web/20120713173804/http://www.thefreehreportonpsu.com/REPORT_FINAL_071212.pdf.
[5] The report also accused Penn State President Graham B. Spanier, Senior Vice President-Finance and Business Gary C. Schultz, and Athletic Director Timothy M. Curley of involvement in the scandal.

temporal nexus where statements were published five months after termination); *Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (noting that alleged defamatory letter written "several weeks" after resignation "was not uttered incident to the termination");

Here, the NCAA issued the Consent Decree nearly six months *after* Appellants were fired. Nothing in the intervening time period suggests a connection between these two events. Appellants were terminated as part of a shake-up in coaching staff that routinely followed the hiring of a new head coach. The "nation-wide media frenzy" surrounding the revelations about Sandusky's abuse, which Appellants say kept alive rumors of their complicity, failed to make their claim of a connection any more plausible. Appellants' Br. at 41.

As such, the Actionable Statement does not constitute the creation or dissemination of a false and defamatory impression for purposes of the stigma-plus test.

## 2. Other Statements

In their complaint, Appellants highlighted the following key phrases from the press releases and the Press Conference Statement as stigmatizing.

- O'Brien Press Release: "A program of this caliber requires a special kind of leader—a leader who will embrace that legacy and maintain the University's commitment to excellence on the field and in the classroom. . . . We have found the man to take Penn State football forward . . . . Needless to say, we have been looking for someone with some very special qualities, beginning with a heart that beats to the values and vision of Penn State University and our Penn State football legacy and tradition. That was our starting point, and Coach O'Brien exemplifies those traits that Penn Staters hold so highly. In addition to his model characteristics as a man and a teacher . . . . He will embrace tradition, demand excellence and pursue Success with Honor in every phase of our program. . . . [S]tated O'Brien. . . . 'As head coach of this special football program, it is my responsibility to ensure that this program represents the highest level of character, respect and integrity in everything we do. That includes my coaching staff . . . .'" First Am. Compl. ¶ 70.

- January 23, 2012 Press Release: "Regrettably, Coach Paterno did not finish his coaching career in the manner he or anyone else expected . . . ." First Am. Compl. ¶ 73.

- February 18, 2012 Press Release (Referring to Coach O'Brien's new coaching staff): "This is a staff made up of men who care about the mission of Penn State University and being successful on and off the field. It is also a staff of winners." First Am. Compl. ¶ 76.

- Press Conference Statements: "[W]e are reserving the right, after the conclusion of all of the criminal charges and proceedings that will go forward to look into any potential investigations or penalties that may need to be imposed on individuals, but for the time being, we're not doing anything with individuals. . . . [T]he NCAA is reserving the right to initiate a formal investigation and disciplinary processes, to impose sanctions as needed on individuals involved in this case . . . . [W]e expressly have, in these sanctions and findings, withheld judgment on individuals, and will continue to do so until all of the criminal investigations have concluded, and until then we won't have any comment on individuals." First Am. Compl. ¶¶ 183–84, 210.

10

- PSU Press Release (Penn State announcing the acceptance of the NCAA's sanctions): "It is with this compass that we will strive for a better tomorrow. Penn State will move forward with a renewed sense of commitment to excellence and integrity in all aspects of our University." First Am. Compl. ¶ 213.

None of the above statements specifically refer to Appellants—either explicitly or implicitly. The only member of the coaching staff during the Sandusky Scandal who is specifically mentioned is Head Coach Paterno. Rather, most of the statements speak to the culture of Penn State and its football program. The Press Conference Statements discuss when the NCAA would proceed with its own investigation against "individuals." It would not be reasonable to conclude that these were false and defamatory statements about Appellants because "individuals" could apply to anyone in the football program or school administrators. As such, these statements do not satisfy the stigma prong of the stigma-plus test.

Because we find that none of the complained of statements are stigmatizing, Appellants did not meet the stigma-plus test and thus did not adequately allege a claim of deprivation of liberty interest in their reputations. The failure to allege a stigma makes it unnecessary for us to determine whether Appellants adequately alleged as a "plus" the deprivation of property interests in their NCAA and Penn State Rights or employment. Therefore, the District Court properly dismissed the § 1983 claim.

### B. Conspiracy Claim

"A claim brought under § 1983 can only be sustained if the defendant has deprived the plaintiff of a federal constitutional or statutory right while acting under color of state

11

law." *Lazaridis v. Wehmer*, 591 F.3d 666, 672 (3d Cir. 2010). Because we find that Appellants' deprivation claim was properly dismissed, we must also find the alleged conspiracy was properly dismissed since an essential element of the conspiracy—deprivation of a federally protected right—does not exist.

### IV. Conclusion

For the foregoing reasons, we will affirm the District Court.