**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAWRENCE ROSENBAUM; ERIC
LIVINGSTON,
　　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

CITY AND COUNTY OF SAN
FRANCISCO; FRED LAU, in his
official capacity as Chief of the
San Francisco Police Dept.; JOEL
ROBINSON, in his official capacity
as Superintendent of the
Recreation and Parks Dept., City
and County of San Francisco;
ANTHONY DELUCCHI, in his official
capacity as Director of Property,
Real Estate Dept., City and
County of San Francisco,
　　　　　　*Defendants-Appellees.*

No. 05-15266

D.C. No.
CV-96-03409-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
December 7, 2006—San Francisco, California

Filed April 30, 2007

Before: Thomas G. Nelson, Ronald M. Gould, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Russell Davis, San Francisco, California; and Frederick H. Nelson, American Liberties Institute, Orlando, Florida, for the plaintiffs-appellants.

Dennis J. Herrera, City Attorney; Molly Stump, Chief Attorney, Public Protection Unit; and Margaret W. Baumgartner, Deputy City Attorney, for defendant-appellee City of San Francisco.

**OPINION**

GOULD, Circuit Judge:

We here consider the free speech rights of Christian evangelists who operate religious outreach with the use of ampli-

fied sound in the streets of San Francisco, and whose efforts have collided with the City of San Francisco's prerogative under its noise ordinance and permitting scheme to ensure that its citizens are not subject to unreasonably loud speech and music. Plaintiffs-Appellants Lawrence Rosenbaum and Eric Livingston filed suit in the Northern District of California alleging constitutional claims under the First and Fourteenth Amendments that arose out of appellee City of San Francisco's permitting process and noise ordinance enforcement, which the district court denied after a bench trial. We have jurisdiction under 28 U.S.C. § 1291.

On appeal, appellants claim that San Francisco police officers unevenly enforced the municipal noise ordinance, in violation of equal protection, by frequently stopping or conditioning appellants' use of amplified sound while leaving other groups' and individuals' loudspeaker use unmolested. Appellants also contend that city officials engaged in viewpoint discrimination. In particular, appellants claim that city officials implemented a "heckler's veto" by responding to complaints by citizens who were hostile to appellants' Christian message. Appellants lodge a second viewpoint discrimination claim that issuance of permits and enforcement were marred by unbridled discretion, and that city police stopped giving permits to appellants for amplified sound activities relying on noise abatement as a pretext to mask viewpoint discrimination. As a third viewpoint discrimination claim, appellants assert that city police cited appellants for disturbing the peace without probable cause because of disagreement with the subject-matter of appellants' speech. Appellants also claim that city officials improperly denied sound permits due to prior restraint where applications were rejected based on appellants' past non-compliance with permit conditions and past violations of the noise ordinance. Finally, appellants argue that the district court erred in not granting relief under the California Constitution's broader protections of free speech. We affirm the district court.

# I

Appellants are Christian evangelists who are staff members of American Christian Enterprises, a non-profit charity organization. Appellant Rosenbaum operates a ministry affiliated with the "SOS Ministries" in San Francisco, which conducts religious outreach. Since 1978, appellants have preached a Christian evangelical message in the streets and parks of San Francisco with amplified sound.

Appellee City of San Francisco ("the City") has adopted under section 47.2 of the San Francisco Police Code ("Police Code") a time, place, and manner restriction that provides, *inter alia*, that "[a]mplified speech and music shall not be unreasonably loud, raucous, jarring or disturbing to persons of normal sensitiveness." *See* S.F.P.C. § 47.2(5). However, individuals or groups seeking to use amplified sound that might exceed volume levels prohibited under § 47.2 may apply for permits under § 43 of the Police Code. Under § 43, the police commissioner[1] has discretion to issue permits for amplified sound for a variety of purposes including public affairs interests. Applicants must designate the time, location and purpose of the permit, *see* § 43(c), and are subject to conditions under S.F.P.C. §§ 47.2 and 49.[2] Denied permits may be contested before the head of the Permit Section where public comment can be considered, or in an administrative proceeding. Police investigations of excessive noise, due to unpermitted amplification, amplification contrary to permit restrictions or volume

---

[1] After the time of the relevant conduct in this appeal, the official body within the City that adjudicates challenges to denied permits has been redesignated as the "Entertainment Commission." *See* S.F.P.C. § 43.

[2] Of concern here is subsection 47.2(7), which provides that amplified sound may be halted if it is audible beyond 250 feet of the attendant audience. *See* S.F.P.C. § 47.2(7). Also, section 49 generally prohibits "amplification of sound or human voice in such a manner as to produce raucous noises or . . . disturb the peace, quiet and comfort of persons in the neighborhood or with volume louder than . . . necessary for convenient hearing." S.F.P.C. § 49.

of amplification, are typically initiated after a citizen complaint. San Francisco police officers may inquire about unacceptably loud noise, issue citations and/or arrest the speaker/performer if they have probable cause under section 415 of the California Penal Code that a user of sound amplification intends to "maliciously and willfully" create "loud and unreasonable noise." *See* Cal. Pen. Code § 415.

For almost three decades, Rosenbaum and Livingston have requested and from time to time received numerous permits from the City for sound amplification to conduct their outreach. Beginning in late 1995, however, many of appellants' permit applications were denied or issued with significant restrictions for specific events. In addition, appellants began to encounter increasing attention from the San Francisco police who, in response to citizen complaints on specified occasions, admonished, cited or arrested appellants, or threatened such sanctions, for not having a necessary permit for their amplified sound, for not complying with the limitations on their permit, or for using excessively loud amplification.

On September 19, 1996, appellants filed suit in the United States District Court for the Northern District of California against the City and County of San Francisco and three city officials in their official capacity (collectively "the City"), seeking injunctive and declaratory relief. Appellants asserted eight claims based on events alleged to have occurred between May 28, 1990 and August 9, 1996: (1) "Enjoinment of San Francisco Police Code § 47.2 on grounds of vagueness and overbreadth"; (2) "Enjoinment of Police Code § 47.2 and Penal Code § 415 and unlawful permitting procedures on equal protection grounds"; (3) "Enjoinment of enforcement of the 'heckler's veto' against plaintiffs"; (4) "Enjoinment of the denial of government permits because said denial is a prior restraint on the free speech rights of the plaintiffs"; (5) "For violation of Title 42 U.S.C. Section 1983"; (6) "For civil conspiracy and for conspiracy to interfere with civil rights in violation of 42 U.S.C. section 1985"; (7) "Violation of the

Religious Freedom Restoration Act"; and (8) "Pendent State Claim for violation of California Constitution Article I, sections 1, 2 and 4." Thereafter, appellants moved for a preliminary injunction to prohibit the City from enforcing § 47.2 of the Police Code and § 415 of the California Penal Code. On November 8, 1996, the district court denied the preliminary injunction, which we upheld on March 26, 1997. *See Rosenbaum v. City & County of San Francisco*, 110 F.3d 69 (9th Cir. 1997) ("*Rosenbaum I*") (unpublished opinion).

In January 1998, the City filed the first of two summary judgment motions. On June 15, 1998, the district court granted partial summary judgment in favor of the City on appellants' First, Sixth and Seventh claims, concluding that the amplification restrictions under § 47.2 were facially constitutional. Appellants did not appeal these rulings. On August 30, 1999, the district court granted the City's motion for summary judgment on the balance of appellants' claims. On April 19, 2001, we reversed, holding that genuine issues of material fact remained regarding appellants' equal protection and First Amendment claims. *See Rosenbaum v. City & County of San Francisco*, 8 Fed. Appx. 687 (9th Cir. 2001) ("*Rosenbaum II*") (unpublished opinion). In reaching this decision with respect to the equal protection claims, we relied on facts not alleged in the complaint, namely allegations that "small groups were allowed to engage in amplified speech activities in the same locations for which plaintiffs were denied permits, and that other small groups were violating the noise ordinances in the same manner as plaintiffs but were not cited or arrested." *Id.* at 691. As examples of this alleged conduct, we referred to incidents that post-dated the filing of the complaint to support our conclusion that "at the summary judgment stage, this as well as other evidence in the record . . . suffices to raise a genuine issue of material fact as to whether there was a 'policy, plan, or a pervasive pattern' of misconduct." *Id.* at 690.

On November 6, 2001, appellants moved to amend their complaint to substitute defendants and to assert a claim for

damages by Livingston involving similar circumstances. Aside from granting the substitution of defendants, the district court denied the motion to amend because an additional damages claim under new factual allegations was unduly delayed and would have prejudiced the City.

At a bench trial in December of 2002, based on the parties' stipulation the district court determined at the outset that the following claims remained: (1) an equal protection claim based on the manner in which the City issued permits and enforced permit requirements for amplified sound; (2) a First Amendment claim based on viewpoint discrimination (or "heckler's veto") in the City's issuance of permits and enforcement of permit requirements; (3) a First Amendment claim of prior restraint in the alleged denial of permits based on appellants' past non-compliance with loudspeaker permit restrictions; (4) a First Amendment claim based on the City's application of California Penal Code § 415; (5) a claim under 42 U.S.C. § 1983 based on the above-described alleged constitutional violations; and (6) a claim under article I, sections 1, 2 and 4 of the California Constitution, also based on violations of rights to free speech and religion.

Before the district court issued its disposition, appellants moved on April 27, 2004 under Federal Rule of Civil Procedure 15(b) ("Rule 15") to expand their claims to encompass events occurring after the filing of their complaint, which the City opposed. In post-trial motions, appellants also sought to introduce additional incidents that allegedly occurred as late as November 8, 2002. Thus, appellants contended that the actionable conduct began as early as May 28, 1990 and continued through November 8, 2002.

The district court issued a Memorandum of Decision on January 12, 2005. As a threshold issue, the district court considered the issue raised in appellants' Rule 15 motion whether numerous incidents alleged to have occurred between appellants and the San Francisco police after the August 9, 1996

filing of the complaint could be included within the scope of actionable conduct. In particular, appellants had previously alleged in a declaration filed in opposition to the City's motion for summary judgment that, beginning on October 11, 1996 and ending on October 31, 1998, they endured additional encounters with the police that resulted in the police "shutting down" appellants' use of unpermitted amplified sound, while the police allegedly acquiesced in other instances of unpermitted or excessively loud sound amplification by similarly situated loudspeaker users, *i.e.* small musical groups and individual performers in addition to promoters of larger events.

The district court first narrowed the scope of actionable conduct under the statute of limitations. The district court determined that the appropriate statute of limitations period for claims under 42 U.S.C. § 1983 and the California Constitution was one year because this period paralleled the limitations period for personal injury suits in California at the time of relevant conduct under section 340(3) of the California Code of Civil Procedure. *See Wilson v. Garcia*, 471 U.S. 261, 275-76 (1985) (holding state statute of limitations period for personal injury suit applies to constitutional claims under § 1983). Under this authority, the district court determined that claims based on events prior to September 19, 1995 were time-barred.

As for post-complaint events, the district court first observed that in appellants' November 2001 motion to amend the complaint, appellants made no effort to supplement the complaint for the purpose of alleging expanded claims based on incidents alleged to have occurred after the filing of the complaint, and that they waited to move expressly to add factual allegations to encompass post-complaint events until April 27, 2004. The district court held that under Rule 15 the City had neither expressly, nor impliedly, consented to such an expansion of claims based on post-complaint factual allegations. In light of our decision in *Rosenbaum II*, however,

where we held genuine issues of material fact existed as to appellants' constitutional claims in part in reliance on facts alleged after the complaint was filed, the district court declined to speculate whether we had decided which events fit within the scope of conduct under the complaint. Leaving the question unanswered, the district court addressed appellants' claims first based solely on alleged conduct between September 19, 1995 and August 9, 1996, and in the alternative, based on alleged post-complaint conduct included in appellants' opposition to the City's motion for summary judgment that we considered in *Rosenbaum II*. In any event, the district court considered evidence of all incidents, irrespective of date of occurrence, to the extent it bore on any alleged pattern or policy of police misconduct.

Under both the narrow and the expanded scope of conduct as described above, the district court rejected all appellants' claims. This timely appeal followed.

## II

We first address what conduct may be considered actionable under the complaint. The City seeks to limit the scope of actionable conduct to events that transpired between September 1995 and September 1996 based on the district court's rulings on the statute of limitations and the denial of appellants' motion on April 27, 2004 under Rule 15(b).[3] In their reply

---

[3]The City argues first that we should not pass on this question because appellants waived these issues by not challenging either the statute of limitations ruling or the Rule 15(b) ruling in their opening appellate brief. "[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief" unless one of three exceptions applies: (1) "for good cause shown," (2) when the issue "is raised in the appellee's brief," or (3) "if the failure to raise the issue properly did not prejudice the defense of the opposing party." *See Koerner v. Grigas*, 328 F.3d 1039, 1048-49 (9th Cir. 2003) (internal quotation marks and citation omitted). Here, although the appellants initially did not contest the district court's rulings on these matters, the City raised the scope of conduct issue in its brief and the appellants responded in their reply brief. Accordingly, we exercise discretion to address the issue.

brief, appellants contend that the district court erred in denying the April 27, 2004 motion and limiting the scope of actionable conduct to events that occurred before the filing of the complaint because we considered post-complaint events in *Rosenbaum II*.

We review the district court's order denying a Rule 15(b) motion to amend the complaint to conform the pleadings to the evidence for an abuse of discretion. *See Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 635 (9th Cir. 2002).

Rule 15(b) provides in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

*See* Fed. R. Civ. P. 15(b); *see also Idaho Plumbers and Pipefitters Health and Welfare Fund v. Mechanical Contractors, Inc.*, 875 F.2d 212, 214-15 (9th Cir. 1989) ("We treat issues tried by the express or implied consent of the parties as raised in the pleadings, even if the parties made no formal amendment.").

In *Patelco Credit Union v. Sahni*, we rejected the argument that certain evidence adduced at trial without objection effectively amended the defendant's answer to include a statute of limitations defense. 262 F.3d 897, 907 (9th Cir. 2001). "While it is true that a party's failure to object to evidence regarding an unpleaded issue may be evidence of implied consent to a trial of the issue, it must appear that the party understood the evidence was introduced to prove the unpleaded issue." *Id.*

(internal quotation marks omitted); *see also Consol. Data Terminals v. Applied Digital Data Sys., Inc.*, 708 F.2d 385, 396 (9th Cir. 1983) ("An adverse party cannot be expected to object to the introduction of evidence that is only tangentially related to the issues actually pleaded prior to trial unless the party has notice that the evidence is being introduced as proof on some other unpleaded issue.").

**[1]** Here, the district court did not abuse its discretion in concluding that the City had not impliedly consented to try appellants' claims based on post-complaint conduct simply because the City referred to events in 1997 and 1998 in responding to appellants' opposition to summary judgment. As the district court correctly found, the thrust of the City's motion for summary judgment pertained to its argument that Livingston and Rosenbaum lacked standing to assert claims for injunctive relief because they could not demonstrate a threat of future harm where "over a three year period, plaintiffs obtained loudspeaker permits for at least seventy-eight events; during 1998 alone, plaintiff received permits for twenty-five events." *See* Def. Mot. for Summ. J., Nov. 16, 1998, at 11. To the extent appellants referenced post-complaint events in their opposition to summary judgment, the district court concluded that such additional factual allegations "reasonably would have been understood . . . to be in response to the City's argument." Also, the City objected at trial to any evidence referring to post-complaint events as irrelevant, and the district court permitted the evidence only for the limited purpose of showing a pattern or practice of discrimination required for injunctive relief. The district court did not abuse its discretion under *Patelco Credit* because there was no indication that appellants introduced the numerous post-complaint events for any purpose other than to refute the City's claim of insufficient threat of future harm in light of its assertion that permits had been issued to appellants during 1998.[4]

---

[4]Our decision in *Rosenbaum II* viewed in context reinforces the district court's conclusion. When we referred to Livingston's arrest on February

**[2]** Because appellants do not explicitly contest the district court's proper statute of limitations ruling, the scope of actionable conduct begins with events that occurred as of September 1995. Because the district court did not abuse its discretion in narrowing the scope of actionable conduct to events alleged in the complaint, we do not consider events after September 19, 1996, except as relevant to any alleged policy or pattern of police misconduct that would warrant injunctive relief.

## III

We review constitutional issues de novo. *See Buono v. Norton*, 371 F.3d 543, 548 (9th Cir. 2004). A district court's determinations on mixed questions of law and fact that implicate constitutional issues are similarly reviewed de novo. *Cogswell v. City of Seattle*, 347 F.3d 809, 813 (9th Cir. 2003). Where, however, the application of the law to the facts requires an inquiry that is "essentially factual," we review for clear error, *see Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002), with exception of issues arising under the First Amendment, where we conduct an independent review of the facts. *See Tucker v. California Dep't of Educ.*, 97 F.3d 1204, 1209 n.2 (9th Cir. 1996).

## IV

In their equal protection challenge under the Fourteenth Amendment, Rosenbaum and Livingston assert: (1) that they were denied permits where similarly situated applicants

22, 1997, and to several permit denials between March 14, 1997 and September 16, 1997, we did so to support our conclusion that the district court erroneously granted summary judgment where these alleged post-complaint events created genuine issues of material fact in regard to the issue whether the City exhibited a policy or pervasive pattern of improper selective enforcement that might warrant injunctive relief. *See Rosenbaum II*, 8 Fed. Appx. at 690.

received permits; (2) that, irrespective of whether they received a permit for sound amplification, the City police "shut down" their amplified speech whereas other similarly situated groups (mainly street musicians), permitted or not, were left unmolested to engage in sound amplification.

A government entity has discretion in prosecuting its criminal laws, but enforcement is subject to constitutional constraints. *See Wayte v. United States*, 470 U.S. 598, 608 (1985).[5] To prevail on its claim under the equal protection clause of the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose. *Id.* at 608. "To establish a discriminatory effect . . . , the claimant must show that similarly situated individuals . . . were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). To show discriminatory purpose, a plaintiff must establish that "the decision-maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610 (internal citation omitted).

In addition to the showing of discriminatory purpose and effect, plaintiffs seeking to enjoin alleged selective enforcement must demonstrate the police misconduct is part of a "policy, plan, or a pervasive pattern." *See Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1993); *see also id.* at 508 ("A state law enforcement agency may be enjoined from committing constitutional violations where there is proof that officers within the agency have engaged in a persistent

---

[5]In the seminal case *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886), the Supreme Court considered an equal protection claim by Chinese nationals who operated laundry businesses in San Francisco that met with all public health requirements, yet the Chinese nationals were still found to have violated city ordinances and fined. The Supreme Court held that no reason for this discrimination existed except hostility to the petitioners' race and nationality, which violated the Fourteenth Amendment's guarantee of equal protection under the law. *Id.*

pattern of misconduct."); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1500 (9th Cir. 1996) (requiring plaintiffs to establish more than repeated incidents of misconduct). Notwithstanding the availability of injunctive relief, declaratory relief may be appropriate where a plaintiff making a facial or as-applied constitutional attack "demonstrates a genuine threat of enforcement of a disputed state criminal statute." *Steffel v. Thompson*, 415 U.S. 452, 475 (1974).

## A

As for appellants' argument urging that there was selective issuance of permits, appellants alleged in their complaint the following instances within the statute of limitations period where they were either denied a permit or issued a permit with restrictions: (1) In February 1996, the City granted two permits for the intersection of Fifth and Market Streets, with the restriction that the speaker be turned away from Market Street; and in March 1996, the City denied Livingston four permit applications for the same intersection. (2) On April 26, 1996, appellants were denied three permits requested for May 4, 11 and 25, 1996 at the corner of Fifth and Market Streets and a resubmitted request for 989 Market Street. (3) On July 1, 1996, appellants received permits for July 20 and August 17, 1996 at 835 Market Street, with the limitation that appellants could not use more than two loudspeakers of no more than 50-watt capacity each.

[3] "The first step in equal protection analysis is to identify the [city's] classification of groups. . . . Once the plaintiff establishes governmental classification, it is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (internal quotation marks omitted). Appellants argue that the district court erroneously rejected appellants' alleged control group—any group or individual, permitted or non-permitted, that appellants observed using amplified sound.

**[4]** Appellants' control group theory is unconvincing. In their focus on selective enforcement, appellants appear not to recognize the district court's distinction between its analysis of alleged equal protection violations based respectively on permit issuance and permit enforcement. Appellants in their complaint refer only to large permitted events that apparently were allowed to continue despite excessive volume and some noise complaints by appellants—the Cinco de Mayo Celebration on May 5, 1996; the "KFOG Sky Concert" on May 11, 1996; the "Making Waves" musical heritage festival on June 21, 1996; and the Gay Pride Celebration on June 30, 1996. As for permit issuance, the district court correctly held that a proper control group would have been smaller groups that applied for permits for sound amplification at similar times and locations. By contrast, appellants' undifferentiated control group of permitted and non-permitted groups, large and small, using amplified sound was not comparable because these groups were not similarly situated because of their varying characteristics. Because appellants did not identify a bona fide control group, they cannot demonstrate a discriminatory effect in the City's issuance of permits for amplified sound.

## B

As for appellants' argument that they were shut down while others were unmolested in selective enforcement of S.F.P.C. § 47.2, appellants alleged in their complaint that the City police in some manner "shut down" appellants' use of amplified sound on six occasions: (1) On February 2, 1996, at 9:00 p.m., the police stopped appellants' use of their 9-watt "maxi mouse" amplifier at Haight and Ashbury Streets based on an alleged violation of the noise ordinance. (2) On March 9, 1996, at 12:15 p.m., Livingston was cited for a noise violation under S.F.P.C. § 47.2 and the outreach rally that had received a permit was discontinued because the investigating officer purportedly could hear the sound from over 250 feet of the attendant audience. (3) On March 29, 1996, at 9:45 p.m. at Haight and Masonic Streets, the police stopped the unpermit-

ted use of the "maxi mouse" amplifier in response to a citizen complaint and threatened to arrest Livingston if the unpermitted activity continued. (4) Similarly, on April 13, 1996, at 5:00 p.m. at Clement and Tenth Streets, two officers threatened to cite appellants for excessive sound during unpermitted activity. (5) On August 2, 1996, Rosenbaum was cited for excessive noise during unpermitted use of the "maxi mouse" amplifier in response to a citizen complaint where the complainant supposedly had been heckling Rosenbaum beforehand. (6) On August 9, 1996, at 9:25 p.m. on Broadway and Columbus Streets, Livingston was arrested for violating S.F.P.C. § 47.2 and § 415 of the California Penal Code.

Appellants argue that the district court erred in adjudicating their equal protection claims by not acknowledging similarly situated groups—"small un-permitted groups . . . allowed to engage in amplified speech activities"—and by requiring that appellants prove that the City had a discriminatory intent. Both theories are unavailing.

Appellants' first argument is not supported by the district court's actual finding. The district court stated that "various street musicians and other entertainers whom plaintiffs observed using amplified sound . . . without police interference . . . *[were] comparable for purposes of equal protection analysis*." (emphasis added). In regard to identifying the control group for purposes of selective enforcement, the district court did not err. Appellants' claim that the district court erred in applying the wrong legal standard, namely that the City was motivated by a "discriminatory intent," is similarly belied by the district court's emphasis on the discriminatory effect and purpose test in *Wayte*, 470 U.S. 598, and its conclusion that appellants did not establish that the City engaged in "purposeful discrimination based on the content of plaintiffs' message." The district court correctly identified the proper control group and applied the correct legal standard for selective enforcement analysis.

**[5]** To the extent appellants claim an equal protection violation because large, permitted events were allowed to continue despite noise complaints, whereas appellants' activities were restricted or terminated in some manner in response to complaints, this claim, too, is unavailing. The district court credited evidence introduced by the City that two different divisions of the San Francisco Police Department are charged with permit issuance and enforcement of the municipal noise ordinances respectively, each with distinct standards and objectives: permits are issued in light of time, place and manner criteria whereas permit enforcement is complaint-based. Aside from anecdotal testimony by Rosenbaum and Livingston that they complained about "loud" music featured at these larger events, appellants did not produce evidence regarding restrictions on these permits, or whether these permit-holders violated any conditions of their respective permits. Without proof of permit violation, the fact that appellants may have complained without police response is not dispositive of any discriminatory effect. Moreover, the fact that officers "shut down" appellants' four instances of unpermitted activity based on citizen complaints does not reflect discriminatory enforcement because the police may legitimately respond to citizen complaints and stop excessive amplified sound, especially if unpermitted, under S.F.P.C. §§ 43, 47.2, and 49. In light of these distinct noise enforcement modes, and the differences in event size, the district court permissibly could conclude that the City did not engage in a pattern of selective noise ordinance enforcement based on the conduct alleged in the complaint.

**[6]** An examination of the events alleged to have occurred post-complaint also does not reveal any pattern of discriminatory noise ordinance enforcement aimed at appellants. To conclude that such a pattern existed, appellants would have to present evidence of a pervasive policy of selective enforcement with respect to the control group of individuals or small groups engaged in unpermitted sound amplification.

In addition to showing that officers within the agency have engaged in a persistent pattern of misconduct, *see Hannigan*, 92 F.3d at 1500, "[l]iability may attach to a municipality only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.' " *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). In a *Monell* claim, there are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity"; (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich*, 308 F.3d at 984-85 (internal quotation marks and citations omitted).

The district court found that there was no discriminatory effect on the following evidence: (1) Appellants' "maximouse" loudspeaker required a permit, which the police only irregularly enforced against the appellants and similarly situated musicians and performers. (2) Under the expanded chronology of reviewable events, the district court addressed a variety of musical groups who were, with one exception,[6] playing without permits at different times and places than appellants.[7] (3) Police asked appellants to turn down their loud-

---

[6]The exception concerned only one incident where appellants' non-permitted activities prompted an admonishment, but a performer named Emerson did not receive a similar warning, among the four incidents where appellants' and Emerson's activities coincided at Taylor and Jefferson Streets from the afternoon to early evening hours on February 8 and 22, 1997, March 22, 1997, and April 12, 1997. The district court ruled that appellants did not prove discriminatory effect based on a single incident.

[7]The district court determined that appellants were told by police to stop preaching with amplified sound or to turn down the volume on the follow-

speaker at Fisherman's Wharf when no other similarly situated groups were playing music. Under these findings, the evidence suggests no pattern of selective enforcement.

In regard to discriminatory effect, it must be first recognized as a general matter that during the approximate seven-year period covered under the complaint and afterward, appellants were often unmolested in using sound equipment to preach the Christian gospel, whether their activities were permitted or not.[8] According to Livingston's own testimony, appellants were able to perform on many occasions from 1995 to 1997 in well-populated San Francisco neighborhoods using a 9-watt "maxi-mouse" amplifier without police interference. This admission suggests that appellants were regularly allowed to preach using non-permitted sound amplification.

Evidence relied on by appellants also supports this conclusion. For instance, appellants point to incidents on June 1 and November 6, 1999, at Powell and Market Streets, where appellants complained about a small protest group using a 10-watt loudspeaker without a permit, but the police allowed the protest to continue. Appellants contend that this type of post-complaint police inaction showed the City's pattern of selective enforcement; however, when viewed in light of appellants' own admission that they also were regularly allowed to continue unpermitted activity, their claim of selective enforcement is undercut. Second, in the vast majority of instances,

---

ing dates and locations: October 11, 1997 at 9:40 p.m. at Broadway and Columbus Avenue; January 9, 1997 at 5:20 p.m. on Haight Street near Ashbury Street; February 22, 1997 at 7:00 p.m. on Market Street near Grand Avenue; and June 26, 1998 at 9:30 p.m. at Taylor and Jefferson Streets.

[8]In support of the conclusion that there was a general acceptance of appellants' ministries in San Francisco, the City issued nine permits in October-December 1995; fifteen permits in 1996; twenty-five permits in 1997; twenty-six permits in 1998; three permits in 1999; forty-seven permits in 2000; forty-four permits in 2001, and thirty-one permits in 2002.

appellants made no showing that they were using amplified sound at the same time and/or location as comparable performers.[9]

[7] As for discriminatory purpose, the City produced evidence that police were responding to citizen complaints or were alerted to appellants' illegal activities (whether permitted or not) because of the excessive noise. Evidence at trial revealed only a few occasions where appellants were using amplified sound and complained about other small groups also engaged in sound amplification in the same vicinity. For example, appellants claim that on August 6, 1996 the police failed to cite Reckless Records, a record store that purportedly played loud music to disturb plaintiffs. While it is true that police issued no citation, police did admonish the record store and ordered it to turn down the music. Moreover, in the single post-complaint incident where appellants were preaching without permitted sound amplification at the same time and location as the performer Emerson, police ordered appellants to stop on one occasion but took no action against Emerson because he was not playing when police arrived.[10] Appellants' claim that police should have remained on the scene due to a likelihood that Emerson would play again is unreasonable given the low law enforcement priority at issue.

---

[9]For instance, appellants cite the testimony of Carl Friedrich, a business manager at Pier 41, who stated that between 1991 and 1997 he complained approximately twenty times that rock music was being played, but no police arrived. However, the potency of this testimony with respect to the claimed discriminatory effect is substantially weakened by the fact that appellants did not allege that they also were active at Pier 41 on these occasions.

[10]Appellants claim that the district court improperly disregarded two other incidents of alleged disparate treatment involving their use of amplified speech coincident with Emerson's street performances, on June 26, 1998 and January 19, 2001, where appellants were "shut down" but Emerson was purportedly allowed to continue. The district court did not commit clear error in dismissing the significance of these incidents because there was insufficient evidence that Emerson was playing when the police arrived.

**[8]** Appellants' claimed acts of selective enforcement did not have a discriminatory effect. There was likewise no evidence to suggest that any action or non-action by the police was taken "because of . . . its adverse effects upon [the] identifiable group."[11] *Wayte*, 470 U.S. at 610. Even if we were to credit the few instances of arguable non-enforcement against similarly situated groups, a pattern or policy of discrimination is not established by these few instances over the entire period where appellants frequently conducted outreach with both permitted and unpermitted amplified sound, and police have discretion to determine the appropriate level of enforcement. *See Hannigan*, 92 F.3d at 1500 (requiring plaintiffs to establish more the repeated incidents of misconduct sufficient for injunctive relief). Appellants' claim for injunctive relief is also flawed because of a lack of evidence that the City had a standard operating procedure or policy directed by an official with final policy-making authority. *See Ulrich*, 308 F.3d at 984-85. We affirm the district court in denying appellants' equal protection claims.

## V

Appellants advance three main theories in claiming that the City engaged in viewpoint discrimination in violation of the First Amendment. First, appellants argue that the City gave effect to an improper "heckler's veto" when officers

---

[11]Due to the absence of a discriminatory effect or purpose, appellants' claim that the district erred in not applying strict scrutiny is meritless. Strict scrutiny only applies once a law is determined to be discriminatory. *See Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 470 F.3d 827, 837-39 (9th Cir. 2006) (discussing type and nature of discrimination that triggers strict scrutiny review). Likewise, appellants' assertion that the district court improperly applied rational basis review is also baseless. The district court made passing reference to "rational basis" only to reject any implied equal protection claim that the permitting ordinance was passed to discriminate against appellants as a discrete class. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (recognizing equal protection violation where ordinance is targeted at single individual because state action is arbitrary and irrational).

responded to noise complaints initiated by citizens who disagreed with the content of appellants' Christian message. Appellants contend that the district court erred in examining the enforcing officer's state of mind to reject discriminatory intent. Second, appellants contend that the district court erred in rejecting viewpoint discrimination because the City exercised unbridled discretion in issuing permits and because the City used the grounds of excessive volume as a pretext for denying loudspeaker permits where the actual basis was the content of appellants' Christian message. Third, appellants argue that the district court erred in finding probable cause to arrest appellants under California Penal Code § 415 for "disturbing the peace," where the motivation implied was disagreement with the content of appellants' speech.

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Sections 43 and 47.2 of the San Francisco Police Code, which jointly comprise the statutory framework governing eligibility for loudspeaker permits, are facially valid as a content-neutral time, place, and manner restriction.[12] *See Faith Ctr. Church Evangelistic Ministries v. Glover*, No. 05-16132, 2007 WL 703599, at *12 (9th Cir. Mar. 9, 2007) ("Content-neutral restrictions that regulate the time, place, and manner of speech are permissible so long as they are 'narrowly tailored to serve a significant government interest, and [they] leave open ample alternative channels of communication.' ") (alteration in the original) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Despite the neutral content of a statute on its face, however, a statute as-applied may be constitutionally infirm if its enforcement is based on viewpoint discrimination. *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) ("An as-applied

---

[12]In fact, after the City successfully moved for partial summary judgment, appellants' claim of facial invalidity was dismissed on June 15, 1998.

challenge alleges that the restriction on speech is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others.") (internal quotation marks omitted). " 'Content discrimination' occurs when the government 'choos[es] the subjects' that may be discussed, while 'viewpoint discrimination' occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) (alteration in the original) (quoting *Perry Educ. Ass'n*, 460 U.S. at 59 (Brennan, J., dissenting)). It should be underscored, however, that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock against Racism*, 491 U.S. 781, 791 (1989).

## A

Appellants argue that the City applied an improper "heckler's veto" when, in regulating amplified speech under S.F.P.C. § 47.2, police officers responded to complaints by citizens who disagreed with the content of appellants' Christian message.

**[9]** A "heckler's veto" is an impermissible content-based speech restriction where the speaker is silenced due to an anticipated disorderly or violent reaction of the audience. *See Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 137 (1992) (invalidating ordinance that allowed county administrator to adjust parade permit fees based on anticipated cost of security). In *Forsyth County*, Chief Justice Rehnquist pointed to the risk of a "heckler's veto" where a permittee might be subject to higher fees because of higher security costs associated with a hostile crowd. *Id.* at 142 (Rehnquist, J., dissenting).

**[10]** Appellants' "heckler's veto" claim here is misconceived. The district court concluded that the City's permitting procedures and enforcement criteria were not motivated by fear of any hostile or unruly reaction by citizens who complained about appellants' activities. Testimony at trial indicated only two incidents within the scope of actionable conduct where citizen complainants may have responded to appellants' Christian message when making noise complaints: (1) On August 2, 1996, a complainant allegedly yelled at appellants that "Christians are child molesters," before lodging a complaint that appellants were disturbing the peace. (2) On August 9, 1996, a complainant purportedly argued with SOS Ministries members and expressed anti-Christian views prior to calling the police. As to these specific exchanges between appellants and citizen complainants, appellants do not allege whether any complainant mentioned any anti-Christian sentiments when filing the complaint. Moreover, to follow appellants' logic and impute the view of the complainant to the investigating officer would lead to an absurd result: In the event a bystander was provoked by the content of a particular message and complained, the speaker could theoretically amplify that message at an intolerable volume with impunity because the enforcement of the complaint would automatically be transformed into a First Amendment violation. As such, we reject appellants' theory. Absent some genuine nexus between a complainant's subject-matter disagreement and the basis for the investigation of the complaint by authorities, appellants cannot prevail on a "heckler's veto" claim of viewpoint discrimination.

**[11]** Here, the district court's findings after bench trial rejected such a nexus. The district court found the testimony of the responding officers to be credible that they were responding only to noise complaints. The district court correctly concluded that there was no "heckler's veto" because appellants did not demonstrate with any evidence that the San Francisco police officers who responded to these specific incidents, or any incidents more generally, knew about, agreed

with or adopted any views of the complainants. To the contrary, the record is clear that officers responding to these two incidents instructed appellants to lower the volume, which would have allowed appellants to express their Christian views; when they refused, however, the officers were again dispatched to control the unreasonably loud speech in response to citizen complaints. The district court also credited police officer testimony that when appellants were told to stop the non-permitted amplified speech that was excessively loud, investigating officers regularly informed appellants that they could continue to preach, albeit without amplification. This reinforces the conclusion that the City was concerned about unacceptable noise levels and not with the content of appellants' Christian message.

**B**

Appellants claim that the district court erred in not addressing their claim of unbridled discretion, which appellants contend allowed the City to engage in viewpoint discrimination. Appellants also contend that because no volume specification was called for on permit applications, evidence that police officers were responding to excessive noise is pretextual and betrays viewpoint discrimination.

**[12]** "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. An ordinance that affords city officials unbridled discretion to determine whether or not to enforce limitations on First Amendment activity may support the inference of viewpoint discrimination. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). As noted above, however, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on

some speakers or messages but not others." *Ward*, 491 U.S.
at 791.

In pressing their theory that the City fell prey to viewpoint
discrimination due to its alleged exercise of unbridled discre-
tion, appellants rely on our decision in *American Jewish
Cong. v. City of Beverly Hills*, 90 F.3d 379 (9th Cir. 1996).
In that case, we considered a claim under the Establishment
Clause of the First Amendment where defendant city gener-
ally proscribed erection of unattended displays on public
property, with a single exception that permitted the presence
of a 27-foot menorah during the Chanukah season. *Id.* at 380-
81. When the city denied permits to two applicants, who were
respectively seeking to create a "winter solstice" scene and
plant a Latin cross on public property, we concluded that the
unique exception to allow the menorah violated the Establish-
ment Clause because it demonstrated a preference for the
Jewish religion, *see id.* at 383, and because the ordinance
vested city officials with unbridled discretion. *Id.* at 384
("The City may not have a general policy banning unattended
private displays, but, on an ad hoc basis with no standards to
guide it, choose one religious group and permit it to erect a
display while denying all other groups permission to erect dis-
plays."). In *American Jewish Congress*, we held that the "ad
hoc and structureless nature of the City's permitting process
leaves open the possibility of improper discrimination by the
City." *Id.* at 385.

**[13]** Contrary to appellants' contentions, under S.F.P.C.
§ 43, the police commissioner has *guided* discretion to issue
permits for amplified sound for a variety of purposes includ-
ing public affairs interests. Applicants must designate time,
location and purpose of the permit, *see* § 43(c), and are
expressly subject to conditions under S.F.P.C. §§ 47.2 and 49.
Section 47.2 prohibits amplified sound from being "unreason-
ably loud [and] raucous" and sets forth the temporal restric-
tion that amplified sound is permitted only between 9:00 a.m.
and 10:00 p.m. and the spatial restriction that amplified sound

cannot be audible from 250 feet of the broadcast area. *See* S.F.P.C. §§ 47.2(2), (5) and (7). In pertinent part, § 49 also prohibits "amplification of sound or human voice in such a manner as to produce raucous noises or . . . disturb the peace, quiet and comfort of persons in the neighborhood or with volume louder than . . . necessary for convenient hearing." *See* S.F.P.C. § 49.

[14] In denying appellants permits, the City based its decision on the fact that the proposed use of amplified sound was unsuitable for the area covered by the requested permit under several statutory criteria. For instance, in the Notice of Decision on May 23, 1996 denying appellants' permit application, the hearing officer noted citizens' complaints that they were being subjected to excessive volumes that disrupted businesses during the day and disturbed residents with children in the evening because of the unreasonably loud volume. The hearing officer also cited repeated direct requests by citizens to Livingston and Rosenbaum to reduce their sound levels. Moreover, the hearing officer credited police statements that appellants routinely could be heard at a distance of more than 250 feet from the sound source. Finally, the hearing officer found that appellants were often unwilling to reach an accommodation with these area residents. As such, the City hearing officer denied the permit application because people near the proposed gatherings were being "subjected to unreasonably loud music and human speech." *See* Notice of Decision, May 23, 1996. Appellants adduced no evidence that City officials were otherwise motivated in denying permits. Finally, as discussed in the context of appellants' equal protection claim, the charge of unbridled discretion is weakened by the fact that on many occasions they applied for and received permits at this and other sites.[13]

---

[13]The City issued nine permits in October-December 1995 and fifteen permits in 1996.

Appellants also assert a claim of pretext that the police routinely requested or forced appellants to cease their permitted amplified speech based on excessive noise, although, according to appellants, the City had no grounds to do so because appellants never requested a particular volume level when applying for a permit. As an initial matter, this factual claim is inaccurate because permits issued under S.F.P.C. § 47(a)(9) are subject to the requirement that applicants indicate "maximum sound-producing power" in terms of specific wattage for the loudspeaker to be used, *see* S.F.P.C. § 47(a)(9), and the record contains numerous permit applications that uniformly request that the applicant indicate a specific wattage. Appellants' argument here suffers from lacking specificity since they have not cited to any particular permit where they did not indicate a volume level. More importantly, whether permitted or not, users of amplified sound are subject to general regulations that "amplified human speech . . . shall not be unreasonably loud, raucous, jarring or disturbing to persons of normal sensitiveness within the area of audibility." S.F.P.C. § 47.2(5), unless specifically granted permission otherwise (*e.g.* for larger events). This evidence defeats appellants' claim of pretext.

**[15]** Because §§ 47 and 47.2 condition both the issuance of sound permits and the use of sound amplification, it is evident that the City did not have unbridled discretion. The Notices of Decision during the relevant period provide content-neutral justifications for appellants' denied permits, and appellants do not facially attack the governing framework for permit issuance under S.F.P.C. §§ 43, 47 and 47.2.

## C

Appellants' third theory of viewpoint discrimination is that the City made no legitimate showing of probable cause when citing Livingston and Rosenbaum under California Penal Code § 415 for "maliciously and willfully" disturbing others. The absence of probable cause, continues appellants' argu-

ment, demonstrates that the City sought to suppress appellants' religious message.[14]

[16] California Penal Code § 415 provides in pertinent part that "[a]ny person shall be punished . . . who maliciously and willfully disturbs another person by loud and unreasonable noise." Cal. Pen. Code § 415(2). As the district court found, "[t]he words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." *See* Cal. Pen. Code § 7. In *In re Brown,* the California Supreme Court clarified the meaning of willful disturbance: "The use of the human voice to disturb others by the mere volume of the sound when there is no substantial effort to communicate or when the seeming communication is used as a guise to accomplish the disruption may be prohibited [under § 415]." 9 Cal. 3d 612, 621 (1973). Although the California Supreme Court concluded in that case that anti-war protesters who carried picket signs, shouted obscenities, and shook their fists at riot police could not be arrested under § 415 because their actions did not pose a clear and present danger of inciting others to violence, the holding was not absolute such "that section 415 may never be applied to loud shouting and cheering." *Id.*

[17] In *Knox v. Southwest Airlines*, we recognized the constitutional principle that "[t]he First Amendment does not prevent enforcement of disorderly conduct statutes so long as they are not vague or applied to curb protected speech." 124 F.3d 1103, 1109 (9th Cir. 1997) (alteration in original) (holding officer's motive for the arrest could not be resolved on summary judgment) (internal quotation marks omitted).

---

[14]We review the district court's finding of probable cause de novo, *see United States v. Nava*, 363 F.3d 942, 944 (9th Cir. 2004); however, historical facts are reviewed for clear error. *See United States v. Vesikuru*, 314 F.3d 1116, 1122 (9th Cir. 2002).

Here, appellants alleged in their complaint two separate incidents where they contend that they were cited under § 415 without probable cause. The district court made the following findings about the incidents:

> At the time of the citation [on August 2, 1996], plaintiff Rosenbaum was using amplified sound in a mixed residential/commercial neighborhood after 9:00 p.m. He did not have a permit to use amplified sound. Officer Mark Landon, a police officer on vehicle patrol, heard the sound from a block away with his windows closed, responded and asked Rosenbaum to turn the sound down. Approximately fifteen minutes later, Officer Landon was dispatched on a noise complaint, at which time the complainant, Joe Narvik, signed a citizen's arrest card. Narvik reported that Rosenbaum was keeping his children awake and had refused to turn the sound down when Narvik requested that he do so.

> At approximately 9:30 p.m. [on August 9, 1996], at Broadway and Columbus Avenue, Livingston was preaching using amplification and had no permit for such amplification. Officer Milan Kangrga, on patrol in the North Beach area, responded to a noise complaint and requested that Livingston turn down his sound, which he did. Officer Kangrga returned, again in response to a noise complaint, at which time the volume was loud, and the complainant, Harry Wamack, who, by his address as indicated in the police report, resides near that intersection, signed a citizen's arrest card. There is no indication of any encounter between the complainant and Livingston in this instance, however, or of the particular manner in which the complainant's peace was disturbed. Nevertheless, given Livingston's lack of permit, his knowledge of a complaint, and his increasing the volume of his amplifier to a high level once the

police had left the scene, it cannot be said that Officer Kangrga had no reasonable cause to believe Livingston did so not to communicate but rather to annoy the individual who had seen fit to report him.

**[18]** "The test for probable cause is whether facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005) (internal quotation marks omitted). Although it is not dispositive, the City introduced testimony that under an informal policy, its police officers have probable cause to believe a speaker "maliciously and willfully" caused a "loud and unreasonable" noise for purposes of § 415 where (1) a citizen has been unreasonably disturbed by sound volume, and is willing to sign a citizen's arrest form to that effect; and (2) the police have cause to believe that the person who is the source of the sound knows that he or she is too loud, but refuses to turn down the volume. Under the test we enunciated in *Menotti*, to sustain the implied claim that the City officers subjected appellants to viewpoint discrimination due to the alleged citation without probable cause, the question is whether a prudent person in the position of the officers who cited appellants would have believed that appellants were committing the offense of disturbing the peace under § 415, with the requisite specific intent to annoy. We conclude that city police here had probable cause.

As for the August 2, 1996 citation, the district court reasonably inferred that Rosenbaum had not adequately lowered the volume of his loudspeakers despite Officer Landon's admonishment, because the volume remained sufficiently loud to rouse a neighborhood resident to complain and sign a citizen arrest form. Testimony to bolster appellants' contention here that Rosenbaum turned off one of his loudspeakers, and turned down the second loudspeaker, was not so credible as

to overcome the inference that his purpose was to annoy Narvik, who, according to the investigating officer, had also requested that Rosenbaum reduce the volume. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (recognizing that trial court's credibility findings are subject to clear error and deserve special deference). Rosenbaum's amplified speech was loud enough to draw Officer Landon to the scene twice within fifteen minutes. There was no clear error in the district court's determination that Rosenbaum's amplified sound remained at an unreasonable volume despite police warnings, from which we may conclude that Officer Landon had probable cause to issue a citation under § 415.

The circumstances surrounding the August 9, 1996 citation also support probable cause for a violation of § 415. Here, Officer Kangrga similarly was twice called to the location where Livingston was engaged in unpermitted amplified speech. Appellants' assertion that no evidence was submitted that Livingston actually "increased" the volume is immaterial in light of Officer Kangrga's testimony. According to Officer Kangrga, Livingston disregarded the initial warning and maintained his volume at an unreasonably loud level so as to prompt another complaint. Because Livingston was on notice after the first warning that his volume was excessive, the district court could draw the permissive inference that Livingston's intent was to annoy or vex. No more is required to make a valid showing of probable cause.

Because both incidents of citation under § 415 were legitimately based on probable cause, the district court correctly rejected appellants' implied viewpoint discrimination claim. Moreover, the district court was also correct that even if probable cause were lacking, these two isolated incidents do not amount to a pattern or policy of abusive citation under § 415, given that two unrelated individuals prompted the complaints and two different officers responded. There was no evidence that the citations were coordinated by an overarching and improper policy or directive. *See Ulrich*, 308 F.3d at 984.

**[19]** Because the district court's findings of probable cause for enforcement of the noise ordinance against appellants is supported by evidence in the record, we affirm the district court's rejection of the viewpoint discrimination claims.[15]

### VI

Appellants argue that the City engaged in unconstitutional prior restraint in rejecting several permit applications based on appellants' non-compliance with conditions attached to sound permits issued in the past.[16]

**[20]** Laws that impose a prior restraint on the free exercise of speech have been disfavored as tantamount to censorship. *See Near v. Minnesota*, 283 U.S. 697, 713 (1931). In *Fernandes v. Limmer* the Fifth Circuit espoused the broad principle that a "[d]enial of a permit for prior violations unquestionably entails a total abridgement of a citizen's right to use the forum . . . ." 663 F.2d 619, 632 (5th Cir. Unit A Dec. 1981). In that case, the Fifth Circuit confronted a local ordinance governing literature distribution and fund solicitation at the Dallas-Fort Worth Airport, which provided, *inter*

---

[15]We conclude that declaratory relief is unnecessary because it would "neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *See United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985).

[16]Appellants assert this claim generally without any reference to particular permit denials or dates when the denials might have occurred. While appellants cite a variety of exhibits in the briefing, these exhibits are not tied to specific motions the district court reviewed. Nor do appellants include in their Excerpts of Record copies of any particular Notices of Decision documenting the City's permit denials. The City, for its part, included in the Supplemental Excerpts of Record copies of Notices of Decision for March 23, 1996; November 8, 1996; March 17, 1997; April 1, 1997; April 7, 1997; June 25, 1997; and September 23, 1997. Because the district court correctly limited actionable conduct to that alleged in the complaint, and our appellate review is similarly limited, we consider only evidence of the May 23, 1996 denial.

*alia*, that permits could be withheld in the event " 'the Appli-cant or any agent or representative of the Applicant . . . has previously violated . . . Regulations of the Dallas-Fort Worth Regional Airport Board, or has violated any of the terms and provisions of any prior Permit.' " *Id.* (quoting local ordi-nance) (alteration in original). Because this statutory subsec-tion effected a categorical denial of permits for prospective activity based solely on the fact of prior violations, the Fifth Circuit invalidated the ordinance on grounds of prior restraint. *Id.*; *see also Kunz v. New York*, 340 U.S. 290, 293 (1951) (holding denial of permit to engage in outdoor religious activ-ity based on earlier revocation of speech permit, where administrative officer had unbounded discretion, was imper-missible prior restraint).

The City relies on a Notice of Decision, issued on May 23, 1996, that upheld the denial of appellants' application for an amplified sound permit proposed for five days in March of 1996 at the intersection of Fifth and Market Streets.[17] A hear-ing was held on May 8, 1996, at which Sergeant Terence Col-lins (head of the Permit Section) reviewed letters written by proponents and opponents of appellants' use of amplified speech, in addition to hearing live public comment.

Among other evidence, the hearing officer considered the testimony of Officer Dan Gallagher. Officer Gallagher ini-tially denied the March 1996 applications, and, in the preced-ing months, had fielded complaints from frustrated citizens who disparaged appellants' use of excessively loud speech and music, and a purported lack of cooperation from represen-tatives of the SOS Ministries who, when asked, refused to

---

[17]From the appellants' briefing, it is evident that appellants decry as prior restraint some aspects of the decision-making process evinced in the March 23, 1996 Notice of Decision. Also, appellants in their complaint alleged the March 1996 permit denials as actionable conduct. To this extent, then, the May 23, 1996 Notice of Decision is an emblematic instance of the challenged City conduct.

lower their loudspeaker volume. Officer Gallagher also testified that business owners in the vicinity complained that they could clearly hear appellants' sound inside their establishments. Officer Gallagher further testified that he had frequent occasions to warn appellants about their excessive sound that violated § 47.2(7) (prohibiting sound that is audible beyond 250 feet of its source), and that he ultimately sent appellants a letter informing them that they would not receive permits if they failed to comply with permit conditions that the volume be maintained at a reasonable level. Finally, Officer Gallagher recounted that at an outreach gathering in the area on March 2, 1996, the City's Noise Abatement Unit received complaints that required a police response. On March 9, 1996, the date on which the last previous permit was issued, Officer Gallagher noted that police were on hand to monitor appellants' use of sound and reported that the speech and music could be heard up to 400 feet away, which again spurred complaints to the Noise Abatement Unit.

The hearing officer reviewed letters and heard comment by various neighborhood civic and business associations who similarly expressed frustration with appellants' persistently loud amplified speech and music. These association representatives mentioned that their members' businesses were disrupted and residents were subject to loud volumes in the late evening when children were trying to sleep. In the case of an assistant manager of the City's Visitor's Information Center, the hearing officer heard that many visitors, some of whom could not speak English well, were unable to communicate effectively because of appellants' use of amplified sound. In addition to recounting a few alleged incidents of being baselessly "shut down," Rosenbaum testified that the problem was not the level of sound, but rather "members of the homosexual community who oppose him."[18]

---

[18]Appellants' on-going presence in some City neighborhoods caused a controversy because some gay members of the community and others

**[21]** Appellants are correct that in the May 23, 1996 Notice of Decision, the City cited prior instances in 1995 and early 1996 where plaintiffs were unwilling to comply with permit conditions as part of its grounds for denial. However, this cannot be viewed in isolation. Aside from the past violations, what is plain from the varied public comments documented in the Notice of Hearing was that appellants' persistent use of unreasonably loud amplified speech and music was disruptive to both businesses and residents at the specified location, the intersection of Fifth and Market Streets. The hearing officer considered not only the misconduct inherent in the past violations, but also previous instances where plaintiffs *received* permits in March 1996 *despite* the widespread complaints in order to provide an "opportunity to reduce the volume of amplified sound in an effort to co-exist with the businesses in the area."[19] Despite this acknowledged accommodation, more complaints from the business community ensued describing the appellants' unwillingness to lower the volume and the appellants' occasional abusive response when asked to do so by fellow citizens. The hearing officer's consideration of the past misconduct was thus aimed at determining the compatibility of the amplified speech and music with the various

---

were angered by what they perceived to be an "anti-gay" message in some of appellants' Christian outreach. However, there is no evidence in the Notice of Decision that local residents or business owners offering public comment focused their opposition on appellants' allegedly "anti-gay" message or that Sergeant Collins gave any weight to any animosity between the SOS Ministries and certain gay community members.

[19]In a Notice of Decision, dated November 8, 1996, plaintiffs were denied a permit based on similar considerations about persistent noise complaints and unwillingness to comply with admonitions to lower the volume, *i.e.* appellants' "spirit of non-cooperation." In this instance, the hearing officer denied the permit because "amplified sound in the densely populated neighborhood of Sixth and Market Streets would have a negative impact and be in conflict with the production at the Golden Gate Theater." Even this denial contained an invitation to reach an accommodation whereby plaintiffs could use a 9-watt bullhorn.

interests in the proposed permit area, not the mere fact of any past violation.

In this light, appellants' reliance on the Fifth Circuit's decision in *Limmer* is inapt. The categorical permit ineligibility at issue in *Limmer* is different from the guided discretion exercised under § 47.2 to deny some of appellants' applications. *See Cox v. New Hampshire*, 312 U.S. 569, 576 (1941). In *Cox*, the Supreme Court rejected a prior restraint claim by Jehovah's Witnesses who chose to march without a parade permit because the city could legitimately enforce a permit requirement as a generally applicable condition for public gatherings where it did not otherwise control or suppress the distribution of literature, the display of placards or individual oration. 312 U.S. at 576 ("If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets.").

In the successful facial challenge in *Limmer*, the impermissible prior restraint was effectuated because *under no circumstances* could an applicant purge the taint of a previous violation. In sharp contrast, the evidence here supports the finding that the City police and its citizens engaged in an ongoing negotiation with appellants to reach accommodation despite the widely complained-of noise violations under § 47.2. Unlike in *Limmer*, where the Fifth Circuit rejected the unequivocal "once a sinner, always a sinner" effect of the Dallas-Fort Worth ordinance, *see* 663 F.2d at 632 (internal quotation marks and citation omitted), appellants here were afforded opportunities to redeem past misconduct and bring their use of amplified sound into reasonable cooperation with other neighborhood activities at the proposed permit site.

The Supreme Court decision in *Kunz*, 340 U.S. 290, on which appellants also rely, is inapposite. In *Kunz*, the defen-

dant city revoked a Baptist minister's permit to hold an outdoor public meeting because he had in the past violated a New York statute forbidding the ridicule and denunciation of other religions. *Id.* at 292. The Supreme Court held that the permit denial due to a past violation of this statute was unconstitutional prior restraint because "the ordinance does not specify this as a ground for permit revocation." *Id.*; *see also id.* at 294 ("[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places.").

[22] Here, the hearing officer's reference to appellants' past violations in context do not show an absolute prohibition based on past violation, but rather that the City hearing officer sought to balance, within constitutional bounds, the competing interests at the proposed permit location. In doing so, the hearing officer reasonably surmised from the instances of past misconduct, on-going complaints, and appellants' apparent recalcitrance that the proposed amplified sound activity was unsuitable for the location and incompatible with other neighborhood activities. Unlike in *Kunz,* the City here did not deprive appellants of permits based on an arbitrary application of an unrelated statute. In contrast to *Limmer*, moreover, no provision of the City's permitting scheme called for a mechanical rejection of appellants' permit application because of past violation of the noise ordinance. Rather, the City's refusal to issue permits in these limited instances was guided by conditions enumerated under S.F.P.C. § 47.2 (*e.g.* the 250-foot distance requirement), which, unlike the unrelated statute in *Kunz*, is expressly cross-referenced in S.F.P.C. § 43, the provision that governs permit issuance. Finally, as we noted previously, the fact that appellants received permits at different city locations reinforces the hearing officer's finding that it was the proposed *location* in the March 1996 permit applications, and not the content of appellants' message, that was unsuitable. As in *Cox*, the City was within its police power to deny permits that might seriously interfere with its streets, *see*

312 U.S. at 575, and did not engage in unconstitutional prior restraint.

**VII**

Appellants contend that the district court erred in not applying a substantive analysis of their free speech claims under article 1, section 2(a) of the California Constitution, which, in appellants' view, provides more expansive rights than federal protections, including a burden on the state to prove that the speech activity was "incompatible" with the public forum. In failing to show incompatibility, appellants argue, the City did not prove that amplified speech by Livingston and Rosenbaum "blocked the sidewalks, caused congestion or otherwise interfered with the use of the public forum . . . ." *See* App. Br. at 24. While acknowledging the asserted broader freedoms under article 1, section 2(a) of the California Constitution, the district court found, without further substantive analysis, "no reason" to conclude that appellants demonstrated a violation of state constitutional rights.

**[23]** Article 1, section 2(a) of the California Constitution guarantees that "[e]very person may freely speak, write and publish his or her sentiments on all subjects." Cal. Const. art. I, § 2(a). "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution." *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1154 (9th Cir. 2003) (quoting *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 908, 910 (1979), *aff'd*, 447 U.S. 74 (1980)). Despite this greater expansiveness of speech rights, article 1, section 2(a) tolerates content neutral speech restriction commensurate with the First Amendment. *See*, *e.g.*, *Pruneyard Shopping Ctr.*, 23 Cal. 3d at 909 (recognizing such permissible restrictions under California Constitution). In the context of amplified sound regulation, time-place-manner restrictions also apply under California law. *See Wollam v. City of Palm Springs*, 59

Cal. 2d 276, 278 (1963) (holding that blanket prohibition against the use of a stationary sound truck exceeded its justification under time, place and manner restriction because the outright ban was not limited to the elimination of loud or raucous noise or necessary for the prevention of traffic hazards).

Here, appellants' contention that their repeated use of amplified sound at excessive volume did not interfere with the public forum is unavailing. As discussed above, the City's Permit Section was presented with ample evidence from businesses and residents in the area around Fifth and Market Streets and elsewhere that the excessive volume was destructive to commerce, interfered with residents' ability to sleep, was often audible from more than 250 feet of the performance site in violation of § section 47.2(7) and prompted widespread complaints.

**[24]** In contrast to *Pruneyard Shopping*, regulation under S.F.P.C. § 47.2 did not prohibit all speech activities, as appellants were informed that they could continue to preach if they would lower the volume of their loudspeakers. More importantly, unlike the blanket prohibition invalidated in *Wollam*, §§ 47 and 47.2 incorporate reasonable enforcement limitations such as maintaining reasonable volume levels, distance requirements, specifying wattage and imposing bans only on amplification before 9:00 a.m. and after 10:00 p.m. *See* S.F.P.C. §§ 47(a) and 47.2. The consequences of amplification at excessive volume is a genuine form of "interference" with the public forum even if it did not block traffic or cause congestion. As such, enforcement of the time, place and manner restriction under S.F.P.C. §§ 43 and 47.2 to curb appellants' use of amplified sound at excessive volumes did not run afoul of the California Constitution.

## VIII

In conclusion, San Francisco's enforcement of its noise abatement ordinance, in its permitting and its law enforce-

ment activities, did not violate the federal constitutional guarantee of equal protection of the laws, or its protection of First Amendment rights. Similarly, San Francisco's enforcement of its noise restrictions against appellants did not offend the California Constitution.

**AFFIRMED.**